**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Thomas B. McNamara

In re:

LANA KAY PAGGEN,

Debtor.

Bankruptcy Case No. 24-12010 TBM
Chapter 13

———————————————————————————————

**MEMORANDUM OPINION AFTER TRIAL**
**SUSTAINING OBJECTION TO PROOF OF CLAIM**

———————————————————————————————

## I.      Introduction.

The Debtor, Lana Kay Paggen (the "Debtor"), filed for protection under Chapter 13 of the Bankruptcy Code.[1]  Her ex-husband, Randy Lynn Sherbon, Jr. ("Mr. Sherbon"), filed a claim for $110,226.54 against the Debtor's bankruptcy estate and asserted that such debt is a domestic support obligation (as defined in Section 101(14A)) entitled to priority of distribution under Section 507(a)(1)(A).  The Debtor did not dispute the amount of her ex-husband's claim.  But, she objected to the characterization of his claim.  The Debtor contended that the debt is merely a property division award — not a domestic support obligation — which is not entitled to priority in the bankruptcy process.  The Court conducted a trial on the dispute.  All that remains is for the Court to decide whether Mr. Sherbon's claim counts as a domestic support obligation under Sections 101(14A) and 507(a)(1)(A).

## II.      Jurisdiction and Venue.

This Court has jurisdiction to enter judgment on the issues presented in this bankruptcy case pursuant to 28 U.S.C. § 1334.  Claims objections are core proceedings under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning administration of the estate), (b)(2)(B) (allowance or disallowance of claims against the estate); and (b)(2)(O) (other proceedings affecting the liquidation of the assets of the estate).  No party has contested the Court's exercise of jurisdiction and entry of judgment on the contested matter.  As such, the Court has jurisdiction to enter judgment on the claim characterization dispute.  Further, venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1]      All references to the "Bankruptcy Code" are to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*.  Unless otherwise indicated, all references to "Section" are to sections of the Bankruptcy Code.

### III.     Procedural Background.

**A.     The Bankruptcy Case.**

On April 22, 2024, the Debtor initiated this bankruptcy case by filing her petition for relief under Chapter 13 of the Bankruptcy Code, along with her Statement of Financial Affairs, and Schedules.  (Docket No. 1 and Stip. Fact No. 4.) [2]  On her Schedule E/F, the Debtor listed a general unsecured debt owed to Mr. Sherbon in the amount of $110,226.54 and noted that the "type of nonpriority unsecured claim" was "obligations arising out of a separation agreement or divorce that you did not report as priority claims."  Adam M. Goodman is the assigned Chapter 13 Trustee (the "Chapter 13 Trustee").

**B.     The Sherbon Claim and the Claim Objection.**

Mr. Sherbon timely filed Proof of Claim No. 4-2 asserting a "domestic support obligation[] . . . under 11 U.S.C. § 507(a)(1)(A)" in the amount of $110,226.54 (the "Sherbon Claim").  The Sherbon Claim references "Permanent Orders entered in Douglas County Case No. 2022DR42."  Notably, the Sherbon Claim matches the amount the Debtor herself identified.  Accordingly, there is no dispute about the amount of the Sherbon Claim.

The Debtor responded to the Sherbon Claim by submitting a "Motion of Objection to Proof of Claim No. 4 by Randy Sherbon" (Docket No. 33, the "Claim Objection") arguing that the Sherbon Claim "is not a domestic support obligation.  Rather it is a dischargeable equalization payment ordered by Douglas County District Court in case 2022DR42."  Again, the Debtor did not contest the amount of the Sherbon Claim.  Next, Mr. Sherbon disagreed and submitted his "Response" (Docket No. 43, the "Response") contesting the Claim Objection.

**C.     The Plans and Confirmation Objections.**

Meanwhile, the Debtor filed a series of Chapter 13 Plans.  (Docket Nos. 6, 26, 38, and 49.)  None of the Debtor's Chapter 13 Plans proposed to pay the Sherbon Claim as a priority under Section 507(a)(1)(A).  Instead, all of the Debtor's Chapter 13 Plans contemplated that the Sherbon Claim would be allowed and receive distributions solely as a general unsecured claim.  The Chapter 13 Trustee and Mr. Sherbon objected to all of the Debtor's Chapter 13 Plans.  (Docket Nos. 15, 19, 28, 29, 41, 42, and 50.)  Mr. Sherbon asserted that all of the Debtor's Chapter 13 Plans were unconfirmable for failure to treat the Sherbon Claim as a priority domestic support obligation.  The Chapter 13 Trustee agreed that the characterization of the Sherbon

---

[2]     The Court takes judicial notice of the docket in this case.  *See St. Louis Baptist Temple, Inc. v. F.D.I.C.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may sua sponte take judicial notice of its docket and the facts that are part of public records).  The Court uses the convention "Docket No. ___" to refer to documents filed in the CM/ECF system in this bankruptcy case.  The Court uses the convention "Ex. ___" to refer to exhibits admitted into evidence at the trial in this bankruptcy case.

Claim was necessary prior to confirmation.  The Court concurred that the Claim Objection would need to be adjudicated before confirmation.  Thus, at this stage, the Court has not confirmed any of the Debtor's Chapter 13 Plans.

**D.     The Trial.**

The Court set the Claim Objection and Response for trial.  (Docket No. 47.)  In the lead-up to trial, the Debtor filed a "[Support] Brief" on the contested domestic support issue.  (Docket No. 52.)  Mr. Sherbon did the same.  (Docket No. 58.)  Thereafter, the Debtor and Mr. Sherbon submitted a "Stipulation of Fa[c]ts and Exhibits."  (Docket No. 57, the "Stipulation of Facts.")

On February 28, 2025, the Court conducted an evidentiary hearing on the Sherbon Claim, Claim Objection, and Response.  During the trial, the Court heard the testimony of: (1) Sue Ann Kokinos (the Debtor's divorce counsel); (2) the Debtor; and (3) Mr. Sherbon.  The Court also admitted into evidence the Debtor's Exhibits A, B, and C as well as Mr. Sherbon's Exhibits 6-9, 11, 12 (in part), and 16 (in part).  After the completion of the evidence, the Court received closing arguments from counsel and took the disputes under advisement.  (Docket No. 64.)  In the interim since the end of the trial, the Court has considered the testimony of the witnesses, reviewed all the admitted exhibits and Stipulation of Facts, and assessed the applicable law.

## IV.     Factual Findings.

The Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052 and 9014(c), based upon the admissible evidence presented at the trial (including both testimony and exhibits) and the Stipulation of Facts.[3]  To the extent that the Court's identification of the foregoing Procedural Background is factual in nature, the Court also incorporates the foregoing Procedural Background as part of the Court's factual findings.

**A.     The Marriage.**

The Debtor and Mr. Sherbon married on September 2, 2015.  (Ex. B at 1.)  During their marriage, the couple resided in a home purchased by the Debtor prior to the marriage and located at 21005 Omaha Avenue, Parker, Colorado (the "Residential Property").  The marriage lasted for about six and a half years.  The Debtor and Mr. Sherbon did not have any children together.  While married, the Debtor and Mr. Sherbon both were employed.  At the end of their marriage, Mr. Sherbon earned a gross annual salary of approximately $85,000 plus benefits, including: use of a

---

[3]      This Order states "findings of fact specially and conclusions of law separately," as required by Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052.  *See S.E.C. v. Anselm Explor. Co.*, 936 F. Supp. 2d 1281, 1285 n.6 (D. Colo. 2013).  "Any finding of fact more properly deemed a conclusion of law, or any conclusion of law more properly deemed a finding of fact, shall be more properly characterized." *Id.*, *see also Kolbe v. Endocrine Servs., P.C.*, 2022 WL 970004 at *3 (D. Colo. Mar. 31, 2022) (same).

company vehicle; gas reimbursement; a 401(k) retirement 5% match; medical, dental and vision benefits; and potential bonus allowances.  At the end of their marriage, the Debtor worked for Colorado Del, LLC (a Colorado franchisee of Del Taco restaurants), as an Operations Manager.  The Debtor earned a gross annual salary of approximately $120,000 plus benefits, including use of a company vehicle and medical benefits.

**B.     The Divorce Case and Dissolution of the Marriage.**

The Debtor filed a "Petition" (the "Divorce Petition") for dissolution of her marriage to Mr. Sherbon on January 21, 2022 in the case captioned: *Lana Kay Paggen v. Randy Lynn Sherbon, Jr.,* Case No. 22-DR-42 (Douglas County District Court, Colorado).  (Ex. B at 1; Ex. 8 at 4.)  The Court refers to the foregoing case as the "Divorce Case" and the foregoing court as the "Divorce Court."  In the Petition, the Debtor did not ask for maintenance from Mr. Sherbon.  ("Maintenance" is synonymous with the terms "alimony" or "support" in the context of Colorado divorce proceedings. COLO. REV. STAT. § 14-10-103 ("the term 'maintenance' includes the term 'alimony'"); COLO. REV. STAT. § 14-10-114(1)(a)(II) ("awarding spousal maintenance may be appropriate if a spouse needs support and the other spouse has the ability to pay support")).  On February 11, 2022, Mr. Sherbon filed a Response to the Petition in the Divorce Case.  (Ex. 8 at 4.)  He did not ask for maintenance from the Debtor.  The Debtor's divorce counsel (Sue A. Kokinos) performed an analysis of possible spousal maintenance.  She determined that given the income of both the Debtor and Mr. Sherbon, the Debtor would not be required to provide Mr. Sherbon with any maintenance.

Subsequently, the Debtor and Mr. Sherbon engaged in a divorce mediation on March 23, 2022.  During the mediation, neither the Debtor nor Mr. Sherbon asked for maintenance. They also agreed to the division of some personal property, but not to the division and allocation of all martial assets and debts.  The main sticking points were: division of the Residential Property (which the Debtor purchased before the marriage); valuation of a dog and numerous guns; accounting for improvements to the Residential Property; and allocation of numerous debts.  (Ex. A and B.)  As a result of their disagreements, the Debtor and Mr. Sherbon did not enter into a definitive separation agreement.  *See* COLO. REV. STAT. § 14-10-112 (governing separation agreements in divorce cases).

Instead, the Debtor and Mr. Sherbon elected to proceed to trial in the Divorce Case.  In preparation for the trial, counsel for the Debtor and Mr. Sherbon filed a "Joint Trial Management Certificate" in the Divorce Case on September 12, 2022.  (Ex. A.)  In the Joint Trial Management Certificate, the Debtor and Mr. Sherbon agreed:

- "The issues in dispute are as follows: [] Division of Assets and Debts."

- ". . . the marital equity in the [Residential Property] subject to division by this Court is $235,000.00."

4

(*Id*. at 2 and 3.)  In stating his separate position for the trial, Mr. Sherbon wrote: "Husband [Mr. Sherbon] seeks an equal division of assets and debts."  (*Id*. at 7.) Notably, in the Joint Trial Management Certificate, neither the Debtor nor Mr. Sherbon asked for maintenance.  Maintenance was not identified as an issue in dispute.  In fact, the word "maintenance" was not even mentioned in the Joint Trial Management Certificate.  Although the Debtor and Mr. Sherbon also exchanged exhibits as part of the Joint Trial Management Certificate process, none of the exhibits related to maintenance issues.  Mr. Sherbon did not file the Spousal Maintenance Worksheet which would have been required before trial in order to request or obtain maintenance.

On September 16, 2022, the Divorce Court conducted a "Permanent Orders Hearing" (the "Divorce Hearing").  Before the Divorce Hearing, neither the Debtor nor Mr. Sherbon ever requested maintenance.   During the Divorce Hearing, neither the Debtor nor Mr. Sherbon raised the topic of maintenance.  Instead, the entire Divorce Hearing centered on the disputed division of assets and debts.  At the end of the Divorce Hearing, the Divorce Court entered a "Decree of Dissolution of Marriage" which divorced the Debtor and Mr. Sherbon.  (Stip. Fact No. 1.)

## C.     Post-Dissolution Events in the Divorce Case.

On November 18, 2022, the Divorce Court announced "an oral ruling regarding permanent orders" which the Divorce Court later characterized as "not a final order of court" (the "Oral Ruling").  (Ex. B at 1 and 7.)  In the Oral Ruling, the Divorce Court determined property division and awarded an "equalization payment in the amount of $21,424.28" to be paid by the Debtor to Mr. Sherbon.  (*Id*. at 7.)  In the Oral Ruling, the Divorce Court did not award any maintenance.  After the Oral Ruling, the Court directed the Debtor's counsel to submit a draft form of written order consistent with the Oral Ruling.  (*Id*. at 1.)  Counsel did so.  At that point, counsel for Mr. Sherbon objected to the proposed form of order and particularly the calculation of the equalization payment. Counsel for Mr. Sherbon did not request maintenance or object to the lack of a maintenance award in the Oral Ruling.  In any event, after the Oral Ruling, the Debtor sent Mr. Sherbon a check for the $21,424.28 equalization payment directed in the Oral Ruling.  Mr. Sherbon refused to cash it and returned the funds to the Debtor.

Meanwhile, the Divorce Court considered Mr. Sherbon's objection and, on May 24, 2023, issued "Permanent Orders" (the "Permanent Orders"), which modified the equalization payment announced in the Oral Ruling.  (Ex. B; Stip. Fact No. 2.)  The Permanent Orders are central to the disputes raised in the Sherbon Claim, Claim Objection, and Response.  At the beginning of the Permanent Orders, the Divorce Court stated:

> **There are no children of the marriage and no maintenance was requested by either party.  The sole issue for Permanent Orders is the division of assets and debts.**

5

(Ex. B at 1-2) (emphasis added).  The foregoing passage is the only time the Divorce Court mentioned the word or topic of maintenance (*i.e.*, neither the Debtor nor Mr. Sherbon requested maintenance).  The Divorce Court further reinforced the lack of any maintenance award by clarifying that the "sole issue" at the Divorce Hearing was "division of assets and debts" (*i.e.,* property division).

In the Permanent Orders, the Divorce Court noted repeatedly that it was applying COLO. REV. STAT. § 14-10-113 which is titled: "Disposition of Property."  The Divorce Court never cited COLO. REV. STAT. § 14-10-114, which is titled: "Spousal Maintenance." Thereafter, the Divorce Court divided the "Assets," including: the marital home; motor vehicles; cash on hand; furniture; household goods; guns and ammunition; stock investments; and pension retirement.  (Ex. B at 4-6.)  Next, the Divorce Court divided debts and applied credits.  To conclude, the Divorce Court ruled:

> [T]he Court hereby issues [an] Amended Division of Assets and Debts spreadsheet and hereby issues the following ORDERS OF COURT regarding equalization payment:
>
> 1.      The Court ORDERS the marital residence to be owned, titled, and possessed by Wife solely.  The net value of the marital home remains $234,508.23 as previously calculated by the Court.  The Court hereby ORDERS Wife's portion of the equitable value of the marital home to be $117,254.12 (50%) and Husband's equitable value of the marital home to be $117,254.11 (50%).  As wife owns and lives in the marital home, Husband's equitable value shall be paid by Wife via equalization payment.
>
> 2.      The Court ORDERS Husband to take possession of the dog and pay out Wife her portion of the equity in the dog, namely $1,750.00, to be calculated within the equalization payment.
>
> 3.      The Court ORDERS Husband to take possession of the addressed guns and ammunition and pay out Wife her portion of the equity in the guns and ammunition, namely $1,700.00, to be calculated within the equalization payment.
>
> 4.      The Court ORDERS Wife to take possession and ownership of the Coinbase account and pay out Husband his portion of the equity in the Coinbase account, namely $869.15.
>
> Thus, the equalization payment from Wife to Husband shall be **$110,226.54** . . . .  The final payment owed from Wife to Husband shall be paid within ninety (90) days of these

written orders.  Wife may either refinance or send a check
directly to Husband.  The Court finds the parties' debts to be
separate and shall not be considered within the equalization
payment calculation.  **The Court considered both
statutory and case law in this property division** and it is
[a] fair and equitable division of assets and debts.

(Ex. B at 8-9) (final emphasis added; footnote omitted).  The Divorce Court attached an
"Amended Court Ordered Division of Assets and Debts" to the Permanent Orders.  (Ex.
C.)  The Amended Court Ordered Division of Assets and Debts is a sort of spreadsheet
specifying the division of property and the equalization payment under the Permanent
Orders.

### D.      The Contempt Motion.

The Debtor did not pay Mr. Sherbon the $110,226.54 equalization payment set
forth in the Permanent Orders.  Accordingly, on August 28, 2023, Mr. Sherbon filed a
"Verified Motion and Affidavit for Citation for Contempt of Court" (the "Contempt
Motion") in the Divorce Case.  (Ex. 6.)  In the Contempt Motion, Mr. Sherbon
characterized the Permanent Orders as follows:

On May 24, 2023, the Court issued its Permanent Orders
ordering Petitioner [the Debtor] to pay Respondent [Mr.
Sherbon] $110,226.54 as his share of the assets of the
marital estate.

(Ex. 6 at 1.)  A hearing on the Contempt Motion was set for May 1, 2024, in the Divorce
Court.

### E.      The Bankruptcy Case.

On April 22, 2024, the Debtor initiated this bankruptcy case by filing her petition
for relief under Chapter 13 of the Bankruptcy Code.  (Docket No. 1 and Stip. Fact No.
4.)  The Debtor's bankruptcy filing stayed adjudication of the Contempt Motion.

The Debtor testified credibly that she filed for bankruptcy because of a series of
unfortunate events.  During October 2023, the Debtor lost her job as an Operations
Manager with Colorado Del, LLC, because of a corporate transaction.  She was
unemployed from approximately October 2023 until March 2024.  She was not able to
obtain unemployment benefits during this period because of identity theft.  In November
2023, the Debtor was incapacitated with COVID.  In December 2023, the Debtor fell and
broke her arm, necessitating surgery, medical expenses, and convalescence.  When
the Debtor finally obtained a new job working at a Mexican restaurant, she was hired at
just $18.50 per hour.  Annualized, her new salary is about $35,000.  Unfortunately, the
Debtor's new salary is about 25-29% of the Debtor's former salary at Colorado Del, LLC
(which was a gross annual salary of $120,000 plus certain benefits).  Meanwhile, during

all the turmoil, the Debtor had a new child: a daughter.  Her daughter also caught COVID, became ill, and had a surgery in April 2024.  Although the Debtor tried to minimize expenses and applied for various forms of assistance (including mortgage deferment, student loan deferment, Medicaid, SNAP benefits, and utilities assistance), she testified that she was unable to meet her financial obligations and so filed for bankruptcy protection.  Although the Debtor had a home equity line of credit on the Residential Property, she did not obtain a loan because she could not afford to pay it back (especially at the high prevailing interest rates in 2023 and 2024).

### F.   Mr. Sherbon's Proposed Use of the Equalization Payment.

Mr. Sherbon testified that after the Permanent Orders he has struggled to support himself albeit that he is employed at a gross annual salary of approximately $85,000, plus benefits, including: use of a company vehicle; gas reimbursement; a 401(k) retirement 5% match; medical, dental and vision benefits; and potential bonus allowances.  Mr. Sherbon testified that he cannot afford to buy a house.  But, if he received the $110,226.54 equalization payment, Mr. Sherbon likely would use such funds as a downpayment to buy a house.  Mr. Sherbon feels that it is not fair that the Debtor has not paid him the $110,226.54 equalization payment ordered by the Divorce Court in the Permanent Orders.  The Court assesses Mr. Sherbon's testimony on these points as quite heartfelt.

## V.   Conclusions of Law.

### A.   General Statutory Framework and Burden of Proof.

In the Sherbon Claim, Mr. Sherbon asserted that he is owed $110,226.54 (which is the amount of the equalization payment in the Permanent Orders).  He characterizes the debt as a domestic support obligation entitled to priority under Section 507(a)(1)(A). In the Claim Objection, the Debtor concedes the amount of the Sherbon Claim but disputes that it is entitled to priority under Section 507(a)(1)(A).  So, the key question is whether the Sherbon Claim entitled to priority under Section 507(a)(1)(A) as a domestic support obligation.

Section 501 provides that a creditor may file a proof of claim.  Mr. Sherbon submitted the Sherbon Claim.  Section 502 states that a proof of claim filed under Section 501 "is deemed allowed, unless a party in interest . . . objects."  11 U.S.C. § 502(a).  The Debtor objected to the Sherbon Claim.  When a proof of claim meets the formal requirements of Fed. R. Bankr. P. 3001, such proof of claim constitutes "prima facie evidence of the validity and amount of the claim."  Fed. R. Bankr. P. 3001(f).  To overcome that presumption, "the objecting party carries the burden of going forward with evidence supporting his objection."  *Abboud v. Abboud (In re Abboud)*, 232 B.R. 793, 796 (Bankr. N.D. Okla. 1999) (quoting *In re Wells*, 51 B.R. 563, 566 (Bankr. D. Colo. 1985)), *aff'd*, 237 B.R. 777 (10th Cir. BAP 1999).  Such evidence must be of probative force equal to that of the allegations contained in the proof of claim.  *Id.* (quoting *Wells*, 51 B.R. at 566).  Once the objecting party has reached such threshold,

8

the creditor has the ultimate burden of persuasion as to the validity and amount of the claim.  *Agricredit Corp. v. Harrison (In re Harrison)*, 987 F. 2d 677, 680 (10th Cir.1993); *Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 260 B.R. 517, 524 (10th Cir. BAP 2001).

**B.      Specific Statutory Framework for Evaluating Whether a Claim is for a Domestic Support Obligation.**

Section 507 governs priorities in bankruptcy and states:

> (a) The following expenses and claims have priority in the following order:
>
> > (1) First:
> >
> > > (A) Allowed unsecured *claims* for *domestic support obligations* that, as of the date of the filing of the petition in a case under this title, are owed to or recoverable by a spouse . . . without regard to whether the claim is filed by such person or is filed by a governmental unit on behalf of such person . . . .

11 U.S.C. § 507(a)(1) (emphasis added).  The critical terms are "claims" and "domestic support obligation."  Fortunately, Congress defined both terms.

The word "claim" means:

> right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matures, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . .

11 U.S.C. § 101(5)(A).  There is no doubt that the Sherbon Claim qualifies as an unsecured "claim" within the meaning of Section 101(5)(A).  After all, the Divorce Court ordered the Debtor to make the equalization payment in the Permanent Orders.  And, again, the Debtor concedes that she has such obligation.

So, the key disputed issue is whether the Sherbon Claim is a "domestic support obligation."  The phrase "domestic support obligation" means:

> a debt that accrues before, on, or after the date of the order for relief in a case under this title, including interest that accrues on that debt as provided under applicable nonbankruptcy law notwithstanding any other provision of this title, that is —

9

(A)  owed to or recoverable by —

(i) a spouse, former spouse, or child of the debtor or such child's parent  . . .

(B) in the nature of alimony, maintenance, or support . . . of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated;

(C) established or subject to establishment before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of —

(i) a separation agreement, divorce decree, or property settlement agreement;

(ii) an order of a court of record; or

(iii) a determination made in accordance with applicable nonbankruptcy law by a governmental unit; and

(D) not assigned to a nongovernmental entity, unless that obligation is assigned voluntarily by the spouse, former spouse, child of the debtor, or such child's parent, legal guardian, or responsible relative for the purpose of collecting the debt.

11 U.S.C. § 101(14A).

Determining whether a debt is a domestic support obligation, as that term is defined in the Bankruptcy Code, is a matter of federal law.  *Sylvester v. Sylvester*, 865 F.2d 1164, 1166 (10th Cir. 1989) (citing *Goin v. Goin (In re Goin)*, 808 F.2d 1391, 1392 (10th Cir. 1987)).  Courts considering whether a debt is a domestic support obligation must evaluate the character of the obligation based on the facts rather than merely relying on the denomination of the obligation in the divorce decree.  *Sampson v. Sampson (In re Sampson)*, 997 F.2d 717, 722-23 (10th Cir. 1993) (citing *Goin*, 808 F.2d at 1392; *Busch v. Hancock (In re Busch)*, 369 B.R. 614, 622 (10th Cir. BAP 2007)).

In the Tenth Circuit, courts must apply a four-part analysis for determining whether a debt is a domestic support obligation within the meaning of Section101(14A).

First, the debt must be owed to either "a spouse, former spouse, or child of the debtor," which is listed under subpart (i), or "a governmental unit," which is listed under subpart (ii). *Id.* § 101(14A)(A)(i), (ii).  Second, § 101(14A)(B) next

10

> requires that the "nature" of the debt be "alimony,
> maintenance, or support (including assistance provided by a
> governmental unit) of such spouse, former spouse, or child
> of the debtor . . . without regard to whether such debt is
> expressly so designated." *Id.* § 101(14A)(B). Third, the debt
> must arise from a separation agreement, divorce decree, or
> property settlement agreement. *Id.* § 101(14A)(C). Finally,
> the debt must not have been assigned to a nongovernmental
> entity, unless for collection purposes. *Id.* § 101(14A)(D).

*Taylor v. Taylor (In re Taylor)*, 737 F.3d 670, 678 (10th Cir. 2013) (footnote omitted).
The *Taylor* requirements essentially track the text of Section 101(14A).

Federal courts and state courts have concurrent jurisdiction to determine the
nature of an obligation arising from a separation agreement, divorce decree, or property
settlement as a matter of bankruptcy law. 28 U.S.C. § 1334(b). *See In re Smith*, 125
B.R. 630, 631 (Bankr. E.D. Okla. 1991) (stating that state court of competent jurisdiction
has concurrent jurisdiction with the bankruptcy court in determining the nature of an
obligation created by a divorce decree); *In re Brown*, 2019 WL 5376541, at *3 (Bankr.
D.N.M. Sept. 25, 2013) ("[S]tate courts have concurrent jurisdiction with bankruptcy
courts to determine whether an obligation is in the nature of support.").

## C.   The Sherbon Claim Is Not a Domestic Support Obligation.

In this case, there is no dispute that the debt owed by the Debtor to Mr. Sherbon
meets three of the four Section 101(14A) requirements. Per Section 101(14A)(A), the
Sherbon Claim is a debt that accrued "before, on, or after" the Petition Date (April 22,
2024) and is "owed to or recoverable by" Mr. Sherbon, who is a former spouse of the
Debtor. Under Section 101(14A)(C), the debt was "established . . . before, on, or after"
the Petition Date by reason of the Permanent Orders issued by the Divorce Court. And,
pursuant to Section 101(14A)(D), the debt has not been assigned to any governmental
entity.

So, the fight is *only* about Section 101(14A)(B): whether the debt is "*in the
nature of alimony, maintenance, or support*" of Mr. Sherbon. If it is, then the debt is a
domestic support obligation and, therefore, a first-priority claim under Section 507(a)(1).
If not, the debt is merely a general unsecured non-priority claim.

Bankruptcy courts apply a broad interpretation to the term "support" in the
"domestic support obligation" context. *Loper v. Loper (In re Loper)*, 329 B.R.
704, 708 (10th Cir. BAP 2005) (citing *Jones v. Jones (In re Jones)*, 9 F.3d 878,
881 (10th Cir.1993)). State law provides "guidance as to whether a debt should
be considered in the nature of support . . . [; h]owever a debt may be in the
nature of support . . . even though it would not qualify as alimony or support
under state law." *Jones*, 9 F.3d at 880 (internal quotations omitted) (citing

*Yeates v. Yeates (In re Yeates)*, 807 F.2d 874, 878 (10th Cir.1986)) (construing the term "support" in context of Section 523(a)(5)).

Both the Debtor and Mr. Sherbon have argued that the Court should apply the Tenth Circuit's "dual inquiry" test to assess whether the $110,226.54 equalization payment is "in the nature of alimony, maintenance, or support" of Mr. Sherbon.  (Docket Nos. 43 and 58 (both referring to "dual inquiry" test).)  In *Taylor*, the Tenth Circuit summarized the "dual inquiry" test and instructed:

> When determining whether an obligation is in the nature of alimony, maintenance, or support, this court conducts a "dual inquiry" looking first to the intent of the parties at the time they entered into their agreement, and then to the substance of the obligation.  *See Sampson,* 997 F.2d at 723; *Sylvester v. Sylvester,* 865 F.2d 1164, 1165 (10th Cir.1989). The nature of the obligation is not restricted to the parties' label in the settlement agreement and is a question of federal law.  *Sylvester,* 865 F.2d at 1166; *see Young v. Young (In re Young),* 35 F.3d 499, 500 (10th Cir.1994) (finding that shared intent "is not limited to the words of the settlement agreement, even if unambiguous" and stating that "the bankruptcy court is required to look behind the words and labels of the agreement in resolving this issue").  That said, state law may inform the nature of the interest.  As "[t]he party seeking to hold the debt nondischargeable," [creditor] bore the burden of establishing by a preponderance of the evidence that the parties intended the debt to be in the nature of support and that the obligation was in substance support. *Sampson,* 997 F.2d at 723.

737 F.3d at 676-77.  The *Taylor* case involved a "Marital Settlement Agreement" which was then incorporated into "a final decree of divorce."  *Id.* at 673; *see also Sampson*, 997 F.2d at 719 (parties entered into a "Property Settlement and Permanent Orders Agreement" which was "incorporated into the divorce judgment").  Since the parties to the divorce entered into a contractual arrangement in the *Taylor* case, the appellate court looked to the "intent of the parties at the time they entered into their agreement." *Id*. at 676; *see also Sampson*, 997 F.2d at 723 (examining the "parties' intent").

This case is slightly different.  The Debtor and Mr. Sherbon did not enter into a definitive contract (such as a separation agreement, "Marital Settlement Agreement," or "Property Settlement and Permanent Orders Agreement").  *See* COLO. REV. STAT. § 14-10-112 (governing separation agreements in divorce cases).  Instead, they could not agree and litigated their dispute in the Divorce Court.  The Divorce Court conducted a trial: the Divorce Hearing.  Then, the Court eventually entered the Permanent Orders (after the Oral Ruling).  Since there was no definitive separation agreement between the Debtor and Mr. Sherbon, when assessing intent under the *Taylor*, 737 F.3d 670, "dual

12

inquiry" approach, the Court must assess the intent of the Divorce Court rather than the intent of the Debtor and Mr. Sherbon. *See Siegfried v. Menter (In re Siegfried)*, 620 B.R. 159, 163 (D. Colo. 2020) ("Where, as here, the debt in question was created by state court order, it is that court's intent that is relevant for purposes of [the *Taylor* "two-part test"].");  *Lobato v. Quintana (In re Lobato)*, 2011 WL 5974674, at *3-4 (Bankr. D. Colo. Nov. 29, 2011) (in absence of agreement between divorcing parties, court looked to "divorce court's intent").

Accordingly, under Tenth Circuit precedent, in determining whether the $110,226.54 equalization payment is "in the nature of alimony, maintenance, or support," the Court must evaluate:

- the intent of the Divorce Court in entering the $110,226.54 equalization payment as part of the Permanent Orders; and

- the "substance" of the $110,226.54 equalization payment under the Permanent Orders.

### 1.     The Divorce Court Did Not Intend that the $110,226.54 Equalization Payment Be "in the Nature of Alimony, Maintenance, or Support."

The best evidence of the Divorce Court's intent is the text and structure of the Permanent Orders. *Lobato*, 2011 WL 5974674, at *4 ("the structure and wording of a divorce decree can provide evidence of a divorce court's intent").  Textually, the Divorce Court did not expressly award maintenance (which is synonymous under Colorado law with "alimony" and support).  COLO. REV. STAT. § 14-10-103 ("the term 'maintenance' includes the term 'alimony'").  Indeed, the Divorce Court's only reference to the word "maintenance" was to explain why no maintenance was awarded:

> There are no children of the marriage and no maintenance
> was requested by either party.  The sole issue for
> Permanent Orders is the division of assets and debts.

(Ex. B at 1-2.)  The Divorce Court did not award maintenance because neither party requested maintenance at any stage of the Divorce Case (*i.e.*, in the Petition, Response to Petition, Joint Trial Management Certificate, or at trial).  Further, neither party submitted a "Spousal Maintenance Worksheet," which would have been required to award maintenance.  Mr. Sherbon's failure to request maintenance in any of his written submissions to the Divorce Court or at the Divorce Hearing likely operated as a functional waiver of maintenance in the Divorce Case.  In fact, Colorado law requires a request for maintenance before maintenance may be awarded.  *In re Marriage of Boyd*, 643 P.2d 804, 805 (Colo. App. 1982) ("Section 14-10-114 [] indicates that maintenance must be sought to be obtained."); *see also* COLO. REV. STAT. § 14-10-114(2) ("At the time of permanent orders in dissolution of marriage . . ., and upon request of either party, the court may order the payment of maintenance from one spouse to the other

13

. . . ."); COLO. REV. STAT. § 14-10-114(3)(a)(I) ("Determination of Maintenance.  When a party has requested maintenance in a dissolution of marriage . . . proceeding, . . . the court shall make written or oral findings concerning [maintenance issues, factors, and guidelines . . . ."). Since Mr. Sherbon did not request maintenance, it follows logically that the Divorce Court could not have intended to award maintenance in the Permanent Orders.  In any event, the Court assesses that the text of the Permanent Orders demonstrates that the Divorce Court intended to enter a property division, not an award of "alimony, maintenance, or support."

Turning from the text to the structure of the Permanent Orders, the entire structure exclusively addresses property division (not maintenance).  At the beginning of the Permanent Orders, the Divorce Court identified the "sole issue":  "The sole issue for Permanent Orders is the division of assets and debts."  (Ex. B at 2.)  Then, the balance of the Permanent Orders divided "Assets"; allocated "Debts"; and applied "Additional Credit."  The Divorce Court's analysis yielded an "Equalization Payment" of $110,226.54.  The Divorce Court characterized its conclusion as "this property division." (Ex. B. at 9.)  Then, the Court assessed that "this property division . . . is [a] fair and equitable division of assets and debts."  (*Id.*)  The Divorce Court also appended an "Amended Court Ordered Division of Assets and Debts" providing a schedule of the property division resulting in the $110,226.54 equalization payment.  Structurally, if the Divorce Court had intended to award maintenance, it would have been required to make "written or oral findings concerning: (A) The amount of each party's gross income; (B) The marital property apportioned to each party; (C) The financial resources of each party . . . .; (D) Reasonable financial need as established during the marriage; and (E) Whether maintenance awarded . . . would be deductible for federal income tax purposes."  COLO. STAT. REV. § 14010-114(3)(a)(I).  The Court did not make such findings, thereby further indicating that it had no intent to award maintenance.  The Court assesses that the structure of the Permanent Orders demonstrates that the Divorce Court intended to make a property division, not award "alimony, maintenance, or support."

The Divorce Court's legal reasoning in the Permanent Orders also suggests that the Divorce Court had no intent to award maintenance.  The Divorce Court noted repeatedly that it was applying COLO. REV. STAT. § 14-10-113 which is titled: "Disposition of Property."  The Divorce Court never cited COLO. REV. STAT. § 14-10-114 which is titled: "Spousal Maintenance."   None of the Divorce Court's legal analysis involves "alimony, maintenance, or support."

The Court recognizes that labels (or in this case the lack of labels pertaining to "alimony, maintenance, or support") may not be dispositive evidence of the Divorce Court's intent.  *Sampson*, 997 F.2d at 722 ("label attached to an obligation does not control"); *Lobato*, 2011 WL 5974674, at *4 (same).  So, when assessing intent, the Court also considers "the surrounding circumstances at the time of the parties' divorce." *See Sampson*, 997 F.2d at 725 (in assessing intent, court should consider "the surrounding circumstances at the time of the parties' divorce"); *Lobato*, 2011 WL 5974674, at *4 (same).  Notably, the time frame for analysis is "the time of the parties'

14

divorce." *Id*. Thus, the large volume of evidence elicited by Mr. Sherbon's counsel concerning the Debtor's post-divorce circumstances and reasons for filing for bankruptcy (*See* Section IV(E) and (F) above) is irrelevant. *Merrill v. Merrill (In re Merrill)*, 252 B.R. 497,508 (10th Cir. 2000) (ex-spouse's "current financial condition is irrelevant to the [domestic support obligation] inquiry").

Turning back to the circumstances at the time of their divorce, the Debtor and Mr. Sherbon were both gainfully employed. Mr. Sherbon earned a gross annual salary of approximately $85,000 plus benefits, including: use of a company vehicle; gas reimbursement; a 401(k) retirement 5% match; medical, dental and vision benefits; and potential bonus allowances. He did not need support for his basic needs in the traditional sense. *See In re Marriage of Rose*, 134 P.3d 559, 561 (Colo. App. 2006) ("Before maintenance may be awarded, the trial court must make a threshold determination that the requesting spouse lacks sufficient property, including marital property, to provide for his or her reasonable needs and is unable to support himself or herself through appropriate employment."); *In re Wise*, 264 B.R. 701, 704 (Bankr. D. Colo. 2001) ("[T]he purpose in requiring one spouse to pay maintenance is to insure that, after dissolution, the basic needs of the disadvantaged spouse are met."). In fact, Mr. Sherbon's income (while perhaps less than he would wish) was well above the $70,545 "Median Family Income" for one wage earner in Colorado at the time of the Permanent Orders (not even accounting for Mr. Sherbon's additional valuable employment benefits). *See* Census Bureau Median Family Income by Family Size (Nov. 1, 2022, to Mar. 31, 2023) available at [www.justice.gov/ust/means-testing/20221101](www.justice.gov/ust/means-testing/20221101) (last visited on Mar. 6, 2025). The Debtor earned a bit more than Mr. Sherbon: a gross annual salary of approximately $120,000 plus benefits, including, use of a company vehicle, and medical benefits. So, while Mr. Sherborn could certainly have used the money from the equalization payment to provide for some of his needs, that circumstance does not equate to a determination that he "*lacked* sufficient property, including marital property, to provide for his . . . reasonable needs and [was] unable to support himself or herself through appropriate employment," *Rose*, 134 P.3d at 561, as would suggest the Divorce Court intended that the property division be for Mr. Sherborn's support rather than a property division. And, again, Mr. Sherbon did not request maintenance (probably because he did not need it).

Based upon the text, structure, merits, and "surrounding circumstances" of the Permanent Orders, the Court concludes that the Divorce Court did not intend that the $110,226.54 equalization payment in the Permanent Orders was "in the nature of alimony, maintenance, or support." Instead, the Divorce Court intended a classic property division.

## 2. The "Substance" of the $110,226.54 Equalization Payment Is Not "in the Nature of Alimony, Maintenance, or Support."

Under the *Taylor* "dual inquiry," the Court cannot rest on intent. Instead, the Court must, as a matter of federal law, mine deeper and assess the "substance of the obligation." *Taylor*, 737 F.3d at 676; *Young v. Young (In re Young)*, 35 F.3d 499, 500

15

(10th Cir. 1994).  "This latter inquiry looks at multiple factors that all focus on the 'critical question' whether the obligation serves the function of support at the time of divorce." *Siegfried*, 620 B.R. at 163. The Court considers the totality of the circumstances and notes at least four factors are considered "pertinent" in the inquiry under prevailing Tenth Circuit precedent:

> (1) if the agreement fails to provide explicitly for spousal support, the court may presume that the property settlement is intended for support if it appears under the circumstances that the spouse needs support; (2) when there are minor children and an imbalance of income, the payments are likely to be in the nature of support; (3) support or maintenance is indicated when the payments are made directly to the recipient and are paid in installments over a substantial period of time; and (4) an obligation that terminates on remarriage or death is indicative of an agreement for support.

*Taylor*, 997 F.2d at 722 (quoting *Goin*, 808 F.2d at 1392-93).

The first *Taylor* substance factor is "if the agreement fails to provide explicitly for spousal support, the court may presume that the property settlement is intended for support if it appears under the circumstances that the spouse needs support." Such factor references "the agreement." But, as previously noted, the Debtor and Mr. Sherbon did not reach a definitive settlement agreement. So, instead, the Court should consider the Permanent Orders issued by the Divorce Court in lieu of an "agreement" The Permanent Orders did not explicitly provide for spousal support for either the Debtor or Mr. Sherbon. Thus, the Court must consider whether Mr. Sherbon "need[ed] support" at the time of the Permanent Orders. *Yeates v. Yeates (In re Yeates)*, 807 F.2d 874, 879 (10th Cir. 1986) ("evidence that payment of the debt is necessary in order for the plaintiff to maintain daily necessities such as food, housing and transportation indicates that the parties intended the debt to be in the nature of support.") The Court received no evidence that Mr. Sherbon needed support. At the time of the Permanent Orders, Mr. Sherbon was employed in a job paying far above the "Median Family Income" for one wage earner in Colorado. He made an annual gross salary of $85,000 plus benefits, including: use of a company vehicle; gas reimbursement; a 401(k) retirement 5% match; medical, dental and vision benefits; and potential bonus allowances. He had no children. He provided no evidence of disability or other condition which would have impeded his employment at the time of the divorce. Meanwhile, the Debtor made somewhat more income.

Mr. Sherbon's economic circumstances are very different than reported decisions in which spouses have shown real need for support irrespective of the labels used in separation agreements or divorce decrees. For example, in *Sampson*, the Tenth Circuit determined that "the surrounding circumstances at the time of the parties' divorce strongly indicate that the obligation was intended as maintenance" because "[a]t the time of the parties divorce, Plaintiff had no job, no marketable skills, little education, a

16

health condition that limited her ability to work, no income, and monthly living expenses of $4,165 . . . ."  997 F.2d at 725.  The appellate court noted that "Plaintiff's obvious need for support at the time of the divorce is enough to presume that the obligation was intended as support even when it is otherwise identified in an agreement between the parties as property settlement."  *Id.  See also Goin*, 808 F.2d at 1393 (affirming that obligation was in nature of maintenance where "wife worked part time as a beauty operator . . . and the $350 a month child support payments were not sufficient to provide the spouse and children with the standard of living to which they had grown accustomed"); *Yeates*, 807 F.2d at 879 ("Plaintiff was in dire financial circumstances at the time of the divorce"); *Cammarota v. Haddad (In re Haddad)*, 639 B.R. 605,  (Bankr. D. Colo. 2022) (finding obligation was in nature of support because "Plaintiff did not make enough in wages to pay for [] rent or any other necessities.  Her immediate prospects were limited . . . .  Her only source of work was a seasonal job at a photography studio, where she earned $9 per hour, but the business offered her very few hours.  [She was] essentially destitute . . . ."); *Lobato*, 2011 WL 5974674, at *5 (finding that where wife "had no job and limited work experience", "spent the majority of her eighteen-year marriage as a homemaker," and "had suffered from a serious brain injury that prevented her from retaining full time employment" . . .or,  "[i]n other words . . . had no means to pay her expenses or to support herself in the future," obligation was in the nature of support).  Suffice to say that Mr. Sherbon, who is employed and earning wages sufficient to pay for rent and other necessities, did not prove a need for support justifying recharacterization of the Permanent Orders.

The second *Taylor* substance factor applies "when there are minor children and an imbalance of income."  In those circumstances, "the payments are likely to be in the nature of support."  But that factor does not help Mr. Sherbon because the Debtor and Mr. Sherbon did not have any children.  And, regardless, there was not such a significant imbalance of income to mandate support.

The third *Taylor* substance factor suggests that "support or maintenance is indicated when the payments are made directly to the recipient and are paid in installments over a substantial period of time."  The Permanent Orders directed the Debtor to pay the $110,226.54 equalization payment in a single lump-sum within ninety days.  The lack of installments over a substantial period of time suggests that the obligation was not "in the nature of alimony, maintenance, or support."

The fourth *Taylor* factor states that "an obligation that terminates on remarriage or death is indicative of an agreement for support."  The Debtor's obligation to make the $110,226.54 equalization payment to Mr. Sherbon did not terminate on remarriage or death.  Thus, the obligation is not "indicative of an agreement for support."

Having considered each of the *Taylor* factors (separately and together) and the totality of the circumstances, the Court concludes that none of the factors or circumstances suggest that the $110,226.54 equalization payment was "in substance" "in the nature of alimony, maintenance, or support."  Instead, all the evidence points to the obligation being a standard property division.  Mr. Sherbon himself acknowledged

17

as much in the Contempt Motion in which he stated that the equalization payment was "his share of the assets of the marital estate." (Ex. 6 at 1.) Just so. And, such property division is, in substance, quite different than alimony, maintenance or support.

        **3.**        **<u>Since the Sherbon Claim is Not "in the Nature of Alimony, Support, or Maintenance," It Is Not a Domestic Support Obligation Entitled to Section 507(a)(1) Priority</u>.**

       Having analyzed the intent of the Divorce Court in entering the Permanent Orders and the substance of the $110,226.54 equalization payment, the Court concludes that the $110,226.54 equalization payment is not a domestic support obligation under Sections 101(14A) and 507(a)(1). In reaching this determination, the Court recognizes the adverse impact on Mr. Sherbon. After all, he was awarded a $110,226.54 equalization payment in the Permanent Orders and he expected to be paid such amount by the Debtor. The Debtor did not honor such obligation and instead filed for bankruptcy protection. But that does not somehow convert what is a property division into a domestic support obligation. In enacting the Bankruptcy Code, Congress determined that only domestic support obligations — not property divisions or settlements — are entitled to Section 507(a)(1) priority. That was a plain policy choice made by the legislature. The Court cannot substitute its own policy preferences in place of the plain dictate of the Bankruptcy Code. In the end, Mr. Sherbon will be in the same position as all other general unsecured non-priority creditors owed money by the Debtor.

          **V.**       **<u>Conclusion and Order</u>.**

       For the foregoing reasons, the Court SUSTAINS the Claim Objection and ORDERS as follows:

       1.      The Court ALLOWS the Sherbon Claim in the amount of $110,226.54 as a general unsecured non-priority claim against the Debtor's bankruptcy estate.

       2.      To the extent that the Sherbon Claim asserts a priority under Section 507(a)(1) as a domestic support obligation, the Court REJECTS such asserted Section 507(a)(1) priority.

       DATED this 11th day of March, 2025.

BY THE COURT:

*Thomas B. McNamara*

Thomas B. McNamara,
United States Bankruptcy Judge

18