## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>LANA KAY PAGGEN,<br><br>Debtor. | Bankruptcy Case No. 24-12010 TBM<br>Chapter 13 |

## OPINION AND ORDER CONFIRMING CHAPTER 13 PLAN

### I.      Introduction.

The Debtor, Lana Kay Paggen (the "Debtor"), filed for protection under Chapter 13 of the Bankruptcy Code.[1]  Her ex-husband, Randy Lynn Sherbon, Jr. ("Mr. Sherbon"), filed a claim for $110,226.54 against the Debtor's bankruptcy estate and asserted that the debt owed to him was a domestic support obligation (as defined in Section 101(14A)) entitled to priority of distribution under Section 507(a)(1)(A).  The Debtor did not dispute the amount of Mr. Sherbon's claim; however, she did contest his assertion that the claim qualified as a domestic support obligation entitled to priority in the bankruptcy process.  The Court conducted a trial on the dispute, after which it determined that Mr. Sherbon's claim was not a domestic support obligation of the Debtor.  *In re Paggen*, 668 B.R. 645 (Bankr. D. Colo. 2025).

With the characterization of Mr. Sherbon's claim decided, the Debtor proceeded to seek confirmation of her most recently filed Chapter 13 plan, which did not afford priority treatment to Mr. Sherbon's claim.  Mr. Sherbon objected and argued that the Debtor's Chapter 13 plan was not proposed in good faith as required by Section 1325(a)(7) and that the Debtor's plan was less favorable to creditors than Chapter 7 liquidation in contravention of Section 1325(a)(4).  The Court conducted another trial.  For the reasons set forth below, the Court overrules Mr. Sherbon's objections and confirms the Debtor's Chapter 13 plan.

### II.      Jurisdiction and Venue.

This Court has jurisdiction to enter judgment on the issues presented in this bankruptcy case pursuant to 28 U.S.C. § 1334.  The plan confirmation dispute is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning administration of the estate), (b)(2)(L) (confirmation of plans), and (b)(2)(O) (other proceedings affecting the

---

[1]      All references to the "Bankruptcy Code" are to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*.  Unless otherwise indicated, all references to "Section" are to sections of the Bankruptcy Code.

liquidation of the assets of the estate).  No party has contested the Court's exercise of jurisdiction and entry of judgment on the contested matter.  Further, venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### III.    Procedural Background.

#### A.    The Bankruptcy Case.

On April 22, 2024, the Debtor initiated this bankruptcy case by filing her petition for relief under Chapter 13 of the Bankruptcy Code, along with her Statement of Financial Affairs, and Schedules.  (Docket No. 1 and Stip. Fact No. 4.) [2]  On her Schedule E/F, the Debtor listed a general unsecured debt owed to Mr. Sherbon in the amount of $110,226.54 and noted that the "type of nonpriority unsecured claim" was "obligations arising out of a separation agreement or divorce that you did not report as priority claims."  Adam M. Goodman (the "Chapter 13 Trustee") was appointed to be the Chapter 13 trustee for the Debtor's estate.

#### B.    The Debtor's Plans and the Sherbon Claim.

The Debtor filed a series of Chapter 13 plans.  (Docket Nos. 6, 26, 38, and 49.) The Debtor did not propose in any of her plans to pay the amount owed to Mr. Sherbon as a priority claim under Section 507(a)(1)(A).  Meanwhile, Mr. Sherbon filed Proof of Claim No. 4-2 asserting a "domestic support obligation[] . . . under 11 U.S.C. § 507(a)(1)(A)" in the amount of $110,226.54 (the "Sherbon Claim") and objected to all of the Debtor's Chapter 13 plans on the ground that they were unconfirmable for failure to treat the Sherbon Claim as a priority domestic support obligation, among other things. (Docket Nos. 19, 29, and 41.)  The Chapter 13 Trustee also objected to the Debtor's plans, in part because of the dispute regarding characterization of the Sherbon Claim. (Docket Nos. 15,  28, and 50.)

Meanwhile, the Debtor objected to the Sherbon Claim by filing a "Motion of Objection to Proof of Claim No. 4 by Randy Sherbon" (Docket No. 33, the "Claim Objection").  In the Claim Objection, the Debtor did not contest the amount of the Sherbon Claim; however, she disputed that the Sherbon Claim was in the nature of a domestic support order such that it should be afforded priority.  All parties agreed that the issue of whether the Sherbon Claim constituted a  domestic support obligation was a threshold matter that needed to be decided prior to plan confirmation.  Therefore, the Court held a trial on the characterization of the Sherbon Claim on February 28, 2025.

After the trial, on March 11, 2025, the Court issued a "Memorandum Opinion after Trial Sustaining Objection to Proof of Claim" (Docket No. 66 and 67, the

---

[2]    The Court takes judicial notice of the docket in this case.  *See St. Louis Baptist Temple, Inc. v. F.D.I.C.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may *sua sponte* take judicial notice of its docket and the facts that are part of public records).  The Court uses the convention "Docket No. ___" to refer to documents filed in the CM/ECF system in this bankruptcy case.  The Court uses the convention "Ex. ___" to refer to exhibits admitted into evidence at the trial in this bankruptcy case.

"Memorandum Opinion"). *In re Paggen*, 668 B.R. 645 (Bankr. D. Colo. 2025). In the Memorandum Opinion, the Court sustained the Claim Objection and ruled that the Sherbon Claim was a general unsecured claim rather than a domestic support obligation. As such, the Court determined that the Sherbon Claim was not entitled to priority treatment under Section 507(a)(1).

## C.    The Operative Plan and Objection to Confirmation.

With the dispute over the priority of the Sherbon Claim decided, the Court set a preliminary hearing on the Debtor's most-recently filed Chapter 13 plan (Docket No. 49, the "Operative Plan"). At the preliminary hearing, held March 19, 2025, the Court set various confirmation deadlines, including for filing objections to confirmation. (Docket No. 71.)

On April 9, 2025, Mr. Sherbon filed a new "Objection to Confirmation of Proposed Amended Chapter 13 Plan (Docket No. 74, the "Plan Objection") in which he asserted that the Operative Plan could not be confirmed because: (1) the Debtor proposed in the Operative Plan to pay creditors less would be payable in a Chapter 7 liquidation, and thus the Operative Plan failed the requirements of Section 1325(a)(4); and (2) the Debtor's petition was not filed in good faith, and thus the Operative Plan did not meet the requirements of 1325(a)(7).[3] In connection with his good-faith objection, Mr. Sherbon maintained that his claim was for a domestic support obligation. Furthermore, at trial, Mr. Sherbon explained that he believed that the Debtor had not filed for bankruptcy protection in good faith because the Debtor was not paying the debt owed to him.

The Court conducted a further confirmation hearing on the Operative Plan on April 30, 2025. At the hearing, counsel for the Chapter 13 Trustee withdrew the Chapter 13 Trustee's objection to confirmation of the Operative Plan and advised that the Chapter 13 Trustee did not oppose confirmation of the Operative Plan. Counsel for the Debtor requested that the Court either (1) overrule the Plan Objection and confirm the Operative Plan; or (2) conduct a limited evidentiary hearing regarding the best interests of creditors objection under Section 1325(a)(4). Counsel for Mr. Sherbon conceded that the portion of the Plan Objection pertaining to characterization of the Sherbon Claim already had been decided in the Memorandum Opinion. However, Mr. Sherbon pressed his objections under Sections 1325(a)(4) and (a)(7) and requested that the Court set a hearing on both such issues.

Based on the representations of the parties, the Court set an evidentiary hearing on the Operative Plan and Plan Objection (except for Mr. Sherbon's reference to the existence of a domestic support obligation). (Docket No. 78.[4])

---

[3]    In the Plan Objection, Mr. Sherbon did not assert that the Operative Plan was filed in bad faith in violation of Section 1325(a)(3). During the trial, counsel for Mr. Sherbon confirmed that the Plan Objection was focused only on Section 1325(a)(4) and (a)(7).

[4]    The trial was originally set for September 10, 2025 (Docket No. 78), but was continued to October 24, 2025. (Docket No. 108.)

D.      **Pretrial Filings and Trial on the Confirmation Issues**.

Prior to the trial, the parties submitted legal briefs in support of their positions on the confirmation issues.  (Docket Nos. 98 and 100.)  In addition, the Debtor filed a "Motion for Adoption of Prior Findings of Fact at Confirmation Hearing (Docket No. 86, the "Motion for Adoption") in which she requested that Court adopt all of the factual findings made by the Court in the Memorandum Opinion for purposes of the confirmation hearing on the Operative Plan.  Mr. Sherbon filed an Objection to the Motion for Adoption (Docket No. 91), arguing against some of the Debtor's requests.  The Court set a pretrial conference and hearing on the Motion for Adoption.  (Docket No. 92.)  After conferring at the hearing, the parties agreed that they did not need to relitigate certain of the findings of fact made by the Court in Sections IV(A) through (D) of the Memorandum Opinion, but stated that, with respect to certain findings, some supplemental evidence should be permitted.  Therefore, the Court granted the Motion for Adoption, in part, ruling that the findings of fact in Sections IV(A) through (D) of the Memorandum Opinion would be adopted for purposes of the trial on confirmation, subject to both parties' being able to provide supplemental evidence related to such factual findings.  (Docket No. 102.)  Shortly before the trial, the parties submitted "Stipulations of Facts and Exhibits" (Docket No. 105, the "Stipulation of Facts") in which they agreed to a few facts, including the facts including those contained in Sections IV(A) and (D) in the Memorandum Opinion.

On October 24, 2025, the Court conducted a trial on the Operative Plan and Plan Objection.  During the trial, the Court heard the testimony of the Debtor and Mr. Sherbon.  The Court admitted into evidence the Debtor's H and Mr. Sherbon's Exhibits 1, 5, 6, 8, 16, and 27.  After the completion of the evidence, the Court received closing arguments from counsel and took the disputes under advisement.  (Docket No. 110.)  In the interim since the end of the trial, the Court has considered the testimony of the witnesses, reviewed all the admitted exhibits and Stipulation of Facts, and assessed the applicable law.

## IV.      **Factual Findings**.

The Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052 and 9014(c),[5] based upon the admissible evidence presented at the trial (including both testimony and exhibits), the findings of fact in Sections IV(A) through (D) of the Memorandum Opinion, and the Stipulation of Facts.  Due to the parties' agreement that the Court should adopt some of the factual findings made in the Memorandum Opinion, portions of the Court's findings herein will

---

[5]      This Order states "findings of fact specially and conclusions of law separately," as required by Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052.  *See S.E.C. v. Anselm Explor. Co.*, 936 F. Supp. 2d 1281, 1285 n.6 (D. Colo. 2013).  "Any finding of fact more properly deemed a conclusion of law, or any conclusion of law more properly deemed a finding of fact, shall be more properly characterized."  *Id.*, *see also Kolbe v. Endocrine Servs., P.C.*, 2022 WL 970004 at *3 (D. Colo. Mar. 31, 2022) (same).

duplicate or be quite similar to the findings of fact in the Memorandum Opinion.  To the extent that the Court's identification of the foregoing Procedural Background is factual in nature, the Court also incorporates the foregoing Procedural Background as part of the Court's factual findings.

### A.    The Parties' Marriage.

The Debtor and Mr. Sherbon married on September 2, 2015.  During their marriage, the couple resided in a home purchased by the Debtor prior to the marriage and located at 21005 Omaha Avenue, Parker, Colorado (the "Residential Property").  The marriage lasted for about six and a half years.  The Debtor and Mr. Sherbon did not have any children together.  While married, the Debtor and Mr. Sherbon both were employed.  At the end of their marriage, Mr. Sherbon earned a gross annual salary of approximately $85,000.00 plus benefits, including:  use of a company vehicle; gas reimbursement; a 401(k) retirement 5% match; medical, dental and vision benefits; and potential bonus allowances.  At the end of their marriage, the Debtor worked for Colorado Del, LLC (a Colorado franchisee of Del Taco restaurants), as an Operations Manager.  The Debtor earned a gross annual salary of approximately $120,000.00 plus benefits, including use of a company vehicle and medical benefits.

### B.    The Divorce Case and Dissolution of the Marriage.

The Debtor and Mr. Sherbon separated in early 2022.  The Debtor filed a "Petition" (the "Divorce Petition") for dissolution of her marriage to Mr. Sherbon on January 21, 2022, in the case captioned: *Lana Kay Paggen v. Randy Lynn Sherbon, Jr.,* Case No. 22-DR-42 (Douglas County District Court, Colorado).  The Court refers to the foregoing case as the "Divorce Case" and the foregoing court as the "Divorce Court."  On February 11, 2022, Mr. Sherbon filed a Response to the Petition in the Divorce Case.

After Mr. Sherbon and the Debtor separated, the Debtor and her attorney engaged in discussions regarding the "worst case scenario" for division of assets.  In exploring her options for payment to Mr. Sherbon, the Debtor went to Canvas Credit Union and learned that they were having a promotion which allowed her to refinance the debt owed on her existing home equity line of credit ("HELOC") at 1.99 percent and to incur debt on the HELOC at that rate for 12 months secured by the Residential Property.

On September 16, 2022, the Divorce Court conducted a "Permanent Orders Hearing" (the "Divorce Hearing").  The entire Divorce Hearing centered on the disputed division of assets and debts.  At the end of the Divorce Hearing, the Divorce Court entered a "Decree of Dissolution of Marriage," thereby dissolving the Debtor and Mr. Sherbon's marriage.

On November 18, 2022, the Divorce Court announced "an oral ruling regarding permanent orders" which the Divorce Court later characterized as "not a final order of

5

court" (the "Oral Ruling"). In the Oral Ruling, the Divorce Court determined property division and awarded an "equalization payment in the amount of $21,424.28" to be paid by the Debtor to Mr. Sherbon. After the Oral Ruling, the Court directed the Debtor's counsel to submit a draft form of written order consistent with the Oral Ruling. Counsel did so. At that point, counsel for Mr. Sherbon objected to the proposed form of order and particularly the calculation of the equalization payment.

Notwithstanding pendency of Mr. Sherbon's objection to the equalization payment, after the Oral Ruling, the Debtor borrowed $21,424.28 from her bank under the HELOC and sent Mr. Sherbon a cashier's check in that amount as an equalization payment, consistent with the Oral Ruling. Though his objection to the proposed form of order had not been ruled upon, Mr. Sherbon demanded that the Debtor acknowledge that the $21,424.28 was only a "partial payment" to him. When the Debtor declined to do so, Mr. Sherbon returned the check, uncashed, to the Debtor. Thereafter, the Debtor returned the funds to Canvas Credit Union under the HELOC.

Later, on May 24, 2023, the Divorce Court issued "Permanent Orders" (the "Permanent Orders") which modified the equalization payment announced in the Oral Ruling and required the Debtor to pay Mr. Sherbon $110,226.54 within 90 days. (Ex. 1.) As set forth in the Memorandum Opinion, the equalization payment constituted a property division rather than a domestic support order.

## C.    Post-Dissolution Change of Circumstances.

While Mr. Sherbon's objection to calculation of the equalization payment was pending before the Divorce Court, in March 2023, the Debtor gave birth to a daughter. She was on maternity leave from March through July 2023, with reduced pay. It was during her maternity leave that the Divorce Court (on May 24, 2023) issued the Permanent Orders increasing the equalization payment from $21,424.28 to $110,226.54 within 90 days.

By this time, though the Debtor had available credit from her bank on the HELOC, the rate on the HELOC had increased from 1.99 percent to about 9 percent. If the Debtor had incurred a $110,226.54 debt on the HELOC so that she could pay Mr. Sherbon, the payment on the HELOC would have been almost two times the amount of the Debtor's primary mortgage payment. With that increase, the Debtor's monthly obligations on the debts secured by the Residential Property would effectively have tripled. Following months of reduced pay and with a new baby to care for, the Debtor felt there was no way she could do this, as using the HELOC would have been "financially irresponsible" and in "bad faith" because the Debtor knew she could not possibly make the required payments to Canvas Credit Union on the HELOC. She and Mr. Sherbon engaged in mediation but were unable to work things out. Suffice to say, the Debtor did not make the increased equalization payment as ordered by the Divorce Court. And then, her circumstances changed again.

In October 2023, the Debtor's job as an Operations Manager at Colorado Del, LLC, was terminated.  The Debtor applied for unemployment benefits, the Supplemental Nutrition Assistance Program ("SNAP"), and Medicaid almost immediately upon the loss of her job.  (Ex. 27.)  Though she received SNAP benefits and qualified for Medicaid quickly, the Debtor's application for unemployment benefits was denied as a result of identity fraud perpetrated by a third party — an issue that was not resolved for six months.  As a result of this delay, and since, as discussed in greater detail later, it was not possible for the Debtor to work for those six months, she did not have income during that period.

Not long after the Debtor lost her job, in November 2023, the Debtor became incapacitated with COVID, as did the Debtor's daughter.  Both were sick through December 2023, and the Debtor's daughter thereafter developed chronic respiratory issues which still require constant treatment with inhalers and nebulizers.

As if dealing with these health issues was not enough, on December 26, 2023, the Debtor fell on black ice and broke her left arm, necessitating surgery, medical expenses, and convalescence.  After the surgery, the Debtor could not bear any weight on the repaired arm.  When the brace and cast came off the Debtor's left arm in late February or early March 2024, she started physical therapy and began looking for jobs, but was restricted in terms of her ability to bear weight.  She still suffers from tendinitis and other physical issues with her left arm.

In February or March 2024, the Debtor borrowed $17,000.00 from Canvas Credit Union under the HELOC to buy a used 2012 Lincoln, as she needed a working vehicle to get to her anticipated job and her and her daughter's various medical appointments.  And, in March 2024, notwithstanding her own health problems and the health issues facing her infant daughter, the Debtor took on a part-time job as a cashier at a restaurant (Corazon de Maiz) owned by the sister of her daughter's father, Francisco Venalanzo.  The Debtor's daughter's father also works at the restaurant.  By that time, the issues with the Debtor's unemployment application had resolved, but, because she was now employed at a new job, her request for benefits was denied.  And, that same month, as a result of her COVID-related respiratory issues, the Debtor's daughter was hospitalized at Parker Adventist Hospital and later transferred to Children's Hospital.  In April 2024, the Debtor's daughter underwent surgery to address her respiratory issues.

All the while, the Debtor was doing physical therapy for her left arm.  But then the Debtor started to have physical issues with her right wrist and forearm as well.  Those issues progressively became worse and worse.  She eventually received steroid injections, which alleviated the pain temporarily, but, in August 2024, had to have surgery on her right arm.  Therefore, the Debtor had limited use of both arms.  But that was not the end of the Debtor's health travails.

Over Christmas 2024, the Debtor became very sick and, by December 27, 2024, found herself in the emergency room.  On December 28, 2024, the Debtor had an emergency surgery to remove her gall bladder.  During the surgery, the Debtor's

doctors made an incidental finding: the Debtor had a tumor the size of a plum growing out of a baseball-sized mass in her liver. She was diagnosed with hepatitis steatosis, a type of liver disease. Doctors also performed a biopsy of the tumor in January 2025. The Debtor now faces the prospect that, at any time, she might need to have a third of her liver removed. In addition, after the gall bladder surgery, the Debtor's oxygen levels fell significantly, so the hospital conducted a sleep study in which the Debtor learned that she suffers from a severe case of obstructive sleep apnea and a 98 percent obstruction of the airway in her nose. Therefore, the Debtor underwent a septoplasty to open her nasal cavity, along with a procedure to reduce her adenoids and glands. During this time, the Debtor developed an infection in her small intestine and had to undergo an endoscopy and colonoscopy.

Just about everything makes the Debtor sick now; so her diet is restricted. She cannot eat greasy food, tomatoes, or anything acidic. She can no longer "eat cheap and quick," but instead "has to eat leaner and healthier." The costs of the Debtor's new diet are greater than the Debtor's prior food costs. And the Debtor's daughter continues to have respiratory issues, many of which are a result of her COVID infection. Though rare in infants, the baby may have the "long-hauler's syndrome" associated with Covid. The baby has had croup and pneumonia, and when she gets sick, she really gets sick, often ending up at Children's Hospital on a nebulizer. The Debtor has a set of steroids on hand so that she can give her daughter's breathing "a kick" even before she takes her to the hospital.

The direct financial costs associated with the Debtor's medical treatment and her daughter's treatment are covered by Medicaid, but the Debtor's life from November 2023 through the present seems to have revolved around hospital visits, treatments and surgeries, physical therapy, and recovery, all while caring for a very young child. This has, understandably, affected the Debtor's ability to perform certain functions as well as the number of hours she can work. Though the Debtor would like to work more and earn more, she considers herself lucky to be employed at Corazon de Maiz, where the owner is someone she has known since she was a child and considers to be family. Mr. Venalanzo helps the Debtor care for their daughter and pays for some diapers, food, clothing and other needs, though the Debtor has the baby full time. Mr. Venalanzo does not make a child support payment. The Debtor has not asked him to do so.

Over time, the Debtor's role at Corazon de Maiz changed from just cashiering to helping her employer coordinate and build another location in Parker, Colorado. At present, the Debtor works about 28 hours a week, sometimes engaging in customer relations work, sometimes cashiering or performing other work functions, and earns $18.50 an hour. Her employer has been flexible with her and more understanding of her limitations than other employers would likely be. The Debtor does not foresee a change in employment or a pay increase and certainly does not see an opportunity to return to the corporate world, where she would have to put in substantially more hours than she believes are possible with a small child as she deals with her own illnesses. The Debtor's life circumstances would have to improve substantially before she could make any job change. She has not applied for any other jobs since March 2024.

D.    **The Contempt Motion**.

On August 28, 2023, after the Debtor failed to pay Mr. Sherbon the $110,226.54 equalization payment in accordance with the Permanent Orders, Mr. Sherbon filed a "Verified Motion and Affidavit for Citation for Contempt of Court" (the "Contempt Motion") in the Divorce Case.  A hearing on the Contempt Motion was set for May 1, 2024, in the Divorce Court.

The Debtor received the Contempt Motion in November 2023, during the time that she and her daughter were sick with COVID, after the loss of her job.  The Debtor remembers that when she received the Contempt Motion, she thought:  "Could this get any worse right now?"  She weighed her options and, by March 2024, with the hearing on the Contempt Motion looming, the Debtor came to the conclusion that bankruptcy was the "best of the poor options available" to her.  She set up a time to meet with an attorney.

E.    **The Bankruptcy Filing**.

On April 22, 2024, the Debtor initiated this bankruptcy case by filing her petition for relief under Chapter 13 of the Bankruptcy Code.  The Debtor's bankruptcy filing stayed adjudication of the Contempt Motion.

The Debtor sought bankruptcy relief with two priorities in mind:  keeping a roof over her head and keeping a vehicle, both of which were necessary to provide for her daughter.  Chapter 13 let her do that.  If there had been any other acceptable option, the Debtor would not have filed for bankruptcy.  She is prideful, a good saver, and has always been financially responsible.  She was hoping to find way to pay Mr. Sherbon — not avoid it.  In any event, the Debtor testified, very credibly, that she filed for bankruptcy because of a series of unfortunate and unexpected events that adversely affected her financial condition including (as set forth above):  the loss of her job as an Operations Manager with Colorado Del, LLC in October 2023; her unemployment from October 2023 through March 2024; her failure to obtain unemployment benefits because of identity theft; her incapacitation from COVID in November 2023; her daughter's medical issues from COVID in November 2023; her physical impairment from breaking her arm and associated surgery in December 2023; time spent in physical therapy in early 2024; her daughter's multiple hospitalizations and surgery in early 2024; and other issues, including the increased costs of caring for a young child. The Debtor simply could not meet her financial obligations to Mr. Sherbon under the Permanent Orders and had no way to pay other creditors.  The Debtor's financial position is still so tenuous that she qualifies for and receives SNAP benefits.

F.    **Effect of the Debor's Failure to Make the Equalization Payment to Mr. Sherbon**.

Mr. Sherbon had counted on using the money from the equalization payment to provide for his own needs.  He is employed and receives a gross annual salary of

approximately $85,000.00, plus benefits, including:  use of a company vehicle; gas reimbursement; a 401(k) retirement 5% match; medical, dental and vision benefits; and potential bonus allowances, but he still struggles to support himself.  If he received the $110,226.54 equalization payment, Mr. Sherbon likely would use such funds as a downpayment to buy a house, but he cannot afford to buy one without such funds.

In connection with filing the Contempt Motion, Mr. Sherbon incurred attorney's fees as well as costs for hiring a process server.  He also incurred fees in connection with preparing for the hearing on the Contempt Motion before the hearing was stayed. And now, in the bankruptcy case, Mr. Sherbon has incurred even more fees in connection with defending the Claim Objection and prosecuting his Plan Objection.

Mr. Sherbon is frustrated and angry — understandably so.  He feels that it is not fair that the Debtor has not paid him the $110,226.54 equalization payment ordered by the Divorce Court in the Permanent Orders (especially since he was left to pay 92 percent of the joint marital debt and will be paid only a fraction of what is owed to him if the Debtor's Operative Plan is confirmed) and maintains that the Debtor should have used her HELOC to obtain credit and pay him.  Mr. Sherbon believes the Debtor wants to avoid paying him anything, and views the Debtor's bankruptcy filing and the Operative Plan as little more than a bad-faith attempt by the Debtor to keep all of the equity in the Residential Property for herself.

## G.   **The Debtor's Assets and Liabilities**.

In her bankruptcy schedules, the Debtor disclosed $655,867.65 in assets and $539,150.17 in liabilities.  (Ex. 15 and Docket No. 1.)  With respect to her assets, in Schedule A/B, the Debtor identified the Residential Property, which she valued at $604,275.00; a 2012 Lincoln automobile with 42,000 miles, which she valued at $10,000.00; a Paychex 401k account worth $32,087.63; cash accounts totaling approximately $3,000.00; and various personal property items.

On Schedule C, the Debtor claimed exemptions in the household and personal goods, in her bank accounts, her retirement accounts, and other assets.  (*Id.*)  Of most significance in Schedule C, the Debtor claimed a $250,000.00 homestead exemption in the Residential Property pursuant to Colo. Rev. Stat. § 38-41-204; a $10,000.00 exemption in the Lincoln pursuant to Colo Rev. Stat. § 13-54-102(1)(j); and an exemption in her 401k account pursuant to Colo. Rev. Stat. § 13-54-102(1)(s).

On Schedule D, the Debtor indicated that the Residential Property was encumbered by two liens:  a mortgage lien in the amount of $295,229.36 held by Flagstarbank and lien in favor of Canvas Credit Union in the amount of $49,296.27. (*Id.*)

The Debtor listed various unsecured debts on Schedule E/F, totaling $194,624.54, including debts owed on credit cards, for student loans, and for legal fees to Sue Kokinos, the Debtor's counsel in the Divorce Case.  (*Id.*)  Of most significance,

the Debtor identified the debt owed to Mr. Sherbon in the amount of $110,226.54, listing it as a nonpriority unsecured claim for "Obligations arising out of a separation agreement or divorce that [the Debtor] did not report as priority claims." In the Memorandum Opinion, the Court determined that the Debtor's characterization of the Sherbon Claim as a nonpriority unsecured claim in Schedule E/F is accurate.

**H.    The Debtor's Income and Expenses.**

In Schedule I, the Debtor states that she is a customer service administrator at "Carazon de Maiz, LLC" [sic], and that she receives $2,245.82 per month in wages. (*Id.*) After tax, Medicare, and Social Security deductions, the Debtor's take-home pay is $1,983.26. In addition to her wage income, the Debtor receives $1,500.00 for renting out a portion of the Residential Property, and $535.00 in SNAP benefits. All told, the Debtor has a combined monthly income of $4,108.26.

The Debtor's expenses are modest. Per the Debtor's Amended Schedule J, she pays $1,353.35 on the first mortgage on the Residential Property, a total of $642.16 on real estate taxes, property insurance, and homeowners' association dues, and $180.10 on the HELOC. (Docket No. 35.) According to the Debtor's Amended Schedule J, after subtracting costs of utilities, food, childcare, medical and dental expenses, transportation and the like, the Debtor estimates monthly net income of only $249.34. (*Id.*) The Form 122C-1 calculation of current monthly income is less, showing a lack of any disposable income. (Docket No. 3.)

**I.    The Operative Plan.**

The Operative Plan is simple. The Debtor proposes to pay the Chapter 13 Trustee $249.00 per month for 59 months, and to make one final payment of $225.00 at month 60, resulting in total payments of $14,914.00. The proposed monthly payments to the Chapter 13 Trustee generally comport with the Debtor's Schedule J estimate of "monthly net income." The Debtor provides in the Plan that such payments will be used as follows: $3,463.00 for unpaid attorney's fees; $6,767.00 to pay an arrearage owed to Flagstarbank on the mortgage on the Residential Property; $3,192.00 to class-four unsecured creditors, including Mr. Sherbon; and $1,492.00 for trustee's compensation. Per the Debtor's analysis in the Plan, the amount payable to class 4 unsecured creditors exceeds the amount they would receive in a Chapter 7 liquidation case.

**J.    Valuation of the Residential Property.**

On her Schedule A/B, the Debtor assigned a value of $604,275.00 to the Residential Property. At trial, the Debtor testified that the value of the Residential Property is slightly less: $603,074.00. The Debtor, who is the owner of the Residential Property, based her testimony upon her familiarity with the condition of the Residential Property and her knowledge of values in the general area. She bolstered her testimony with a Redfin Sales Estimate (admitted into evidence as Ex. H) listing a "Redfin

11

Estimate" of $603,074.00.  The Court received no other admissible evidence of value.  Accordingly, the Court finds that the value of the Residential Property is: $603,074.00.

**K.      Honesty and Credibility.**

The Court finds that the Debtor is an honest and credible person, beset with a set of difficult circumstances that left her unable to repay her debts while maintaining a roof over her head and a vehicle so that she could work to provide for her family in a relatively meager manner.  The Court finds that Mr. Sherbon too, is an honest and credible person, and credits his testimony that he will not able to afford a home unless he is paid the equalization payment under the Permanent Orders.

<strong>V.  Conclusions of Law.</strong>

**A.      General Statutory Framework and Burden of Proof.**

"The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'"  *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) (quoting *Grogan v. Garner*, 498 U.S. 279, 286, 287 (1991)).  However, such purpose is balanced with the goal of ensuring that creditors of a debtor are fairly and equitably treated in the process.  *In re Wark*, 542 B.R. 522 (Bankr. D. Kan. 2015) (citing *In re Westby*, 473 B.R. 392, 401 (Bankr. D. Kan. 2012) and *Schwab v. Reilly,* 560 U.S. 770, 791-92 (2010)).  Per the Supreme Court:

> Chapter 13 of the Bankruptcy Code affords individuals receiving regular income an opportunity to obtain some relief from their debts while retaining their property.  To proceed under Chapter 13, a debtor must propose a plan to use future income to repay a portion (or in the rare case all) of his debts over the next three to five years.  If the bankruptcy court confirms the plan and the debtor successfully carries it out, he receives a discharge of his debts according to the plan.

*Bullard v. Blue Hills Bank*, 575 U.S. 496, 498 (2015).  While many Debtors file for Chapter 13 relief because they do not qualify for Chapter 7, others commit themselves to the Chapter 13 process for a period of years for the express purpose of retaining property: usually a vehicle and/or a home.

In contrast to Chapter 7 liquidation, Chapter 13 of the Bankruptcy Code "allows a debtor to retain his property if he proposes, and gains court confirmation of, a plan to repay his debts over a three- to five-year period."  *Harris v. Viegelahn*, 575 U.S. 510, 514 (2015).  Under Section 1322(a)(1), a Chapter 13 plan must "provide for the submission of all or such portion of future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan."  11 U.S.C. § 1322(a)(1).  The Debtor here has met the mandate of Section 1322.

12

In addition, Section 1325(a) requires that the Court "shall confirm a plan" if certain conditions are met.

The Debtor asserts that she has met all the requirements of Section 1325(a) and urges confirmation of the Operative Plan.  Mr. Sherbon disagrees, arguing that the Debtor has not met her obligations under Sections 1325(a)(4) and (a)(7).  In relevant part, Section 1325(a) provides that the Court shall confirm a plan if

> (4) the value, as of the effective date of the plan, of property
> to be distributed under the plan on account of each
> allowed unsecured claim is not less than the amount that
> would be paid on such claim if the estate of the debtor
> were liquidated under chapter 7 of [the Bankruptcy Code]
> on such date; [and] . . .

> (7) the action of the debtor in filing the petition was in good
> faith.

11 U.S.C. § 1325(a)(4) and (a)(7).[6]

The Debtor bears the burden of proving the required elements of Section 1325. *In re Gosch*, 627 B.R. 669, 680 (Bankr. D. Colo. 2021); *In re Styerwalt*, 610 B.R. 356, 368 (Bankr. D. Colo. 2019); *In re Melendez*, 597 B.R. 647, 657-58 (Bankr. D. Colo. 2019); *In re Vinger*, 540 B.R. 782, 786 (Bankr. D. Colo. 2015); *In re McDonald*, 508 B.R. 187, 205 (Bankr. D. Colo. 2014).  The legal standard is the preponderance of the evidence.  *In re Fassi*, 2013 WL 2190158, at *1 (Bankr. D. Colo. May 21, 2013) (citing *Ho v. Dowell (In re Ho)*, 274 B.R. 867, 883 (9th Cir. BAP 2002)).

**B.   The Operative Plan Satisfies Section 1325(a)(4).**

Under Section 1325(a)(4), a debtor must show that "the value . . . of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . ."  This is often referred to as the "best interest of creditors" test.

> In order to satisfy the best interests test, Debtors are not
> required to pay into their Chapter 13 plan the full amount a
> Chapter 7 Trustee could potentially recover or the full value
> of an asset that could be liquidated, but instead they are

---

[6]   Section 1325(a) also contains other confirmation requirements not attacked by Mr. Sherbon in the Plan Objection.  The subsections of Section 1325(a), which are essentially the elements a debtor must demonstrate to confirm a plan, are listed in the conjunctive and not in the disjunctive.  So, a debtor must prove all applicable requirements to achieve confirmation.  If a debtor fails to prove one element, that failure is fatal to confirmation.  The Court concludes that the Debtor has satisfied all requirements of Section 1325(a).

> required to pay into their Chapter 13 plan an amount that is
> at least equal to the amount that the creditors would receive
> following a Chapter 7 liquidation.  When factoring in
> expenses such as Chapter 7 Trustee's fees and costs of
> sale, the amount creditors are due to receive will almost
> always be considerably lower than the full value of the
> property acquired by the Chapter 7 trustee.

*In re Steele*, 403 B.R. 882, 889 (Bankr. D. Kan. 2007) (internal footnote omitted).  *See also In re Delbrugge*, 347 B.R. 536, 539 (Bankr. N.D. W.Va. 2006) (holding that best interests test must take into account costs of sale, trustee's fees, and other amounts that would be deducted in chapter 7 liquidation of property); *In re Rivera*, 116 B.R. 17 (Bankr. D.P.R. 1990) ("[T]he debtor is entitled to deduct from any apparent equity, the costs of Chapter 7 liquidation including likely administration expenses, i.e. trustees, brokers, appraisers, auctioneers and attorneys.").

In the Operative Plan, the Debtor ascribes a value of $604,275.00 to the Residential Property.  After deducting the secured claims totaling $344,525.00, a $250,000.00 homestead exemption, and costs sale of $36,525.00 (calculated as 6 percent of the total value of the home), the Debtor calculates a Chapter 7 liquidation value for the Residential Property of $0.00 in the Operative Plan.

Mr. Sherbon disputes that the Operative Plan provides for payment of more to unsecured creditors than a Chapter 7 liquidation, arguing that the Debtor is both understating the value of the Residential Property and inflating the costs of selling the Residential Property.  Mr. Sherbon did not attack the valuation of any other assets and did not present any admissible evidence supporting his position vis-à-vis the Residential Property other than a $615,000.00 valuation used in the Divorce Case.

At trial, the Debtor testified that in her opinion, the current value of the Residential Property is $603,074.00 (which is slightly lower than the value a few years ago during the Divorce Case).  She based this opinion on her knowledge of the Residential Property and the neighborhood, as well as the assessed value of the Residential Property, and the value attributed to the Residential Property by online sources such as a Redfin Estimate.  (Ex. H.)  No other evidence of value was admitted into evidence.  No party provided evidence regarding costs of sale.

The Court already has determined, based on the admissible evidence, that the current pre-sale value of the Residential Property is $603,074.00.  The Court further finds, based on its own knowledge gained from years of presiding over bankruptcy cases in which it was called upon to review and approve contracts for sale of residential properties, that it would cost at least the amount provided for in the Operative Plan ($36,525.00) to sell the Residential Property, assuming real estate broker's fees of 5-6 percent and closing costs of 1-4 percent for title, transfer taxes, fees, and other similar costs.  If anything, the costs provided for by the Debtor are low — typically, the Court sees costs in the 7-10 percent range.  *See In re Dixon*, 140 B.R. 945, 947 (Bankr.

W.D.N.Y. 1992) (allowing a 10 percent deduction from estimated sales price to account for costs of sale in chapter 7 based on court's experience); *In re Wilheim*, 29 B.R. 912, 914 (Bankr. D. N.J. 1983) (including in best interests analysis a 6 percent cost-of-sale for expenses "such as appraisal fees, trustee's fees and real estate or auctioneer's commissions normally incurred in a Chapter 7 liquidation proceeding").

Therefore, based on a $603,074.00 pre-sale value for the Residential Property, and subtraction of secured claims totaling $344,525.00, a $250,000.00 homestead exemption, and $36,525.00 in costs of sale, the Residential Property would have no liquidation value in a Chapter 7 case. Furthermore, assessing all the Debtor's remaining non-exempt property, the Court finds that the Operative Plan proposes to pay creditors far in excess of what they would obtain in a Chapter 7 liquidation. Accordingly, the Debtor has satisfied the best interests of creditors test under Section 1325(a)(4).

**C.** **The Operative Plan Satisfies Section 1325(a)(7).**

**1.** **The Totality of the Circumstances Standard and the *Gier* Factors.**

Section 1325(a)(7) mandates that the debtor prove that "the action of the debtor in filing the petition was in good faith." The Section 1325(a)(7) "good faith filing" requirement was added to Section 1325 with the codification of the Bankruptcy Abuse Protection and Consumer Protection Act of 2005. *In re Tomasini*, 339 B.R. 773, 775 (Bankr. D. Utah 2006).

"In analyzing whether a debtor filed a petition or proposed a plan in good faith, bankruptcy courts must consider the totality of the circumstances and determine 'whether or not under the circumstances of the case there has been an abuse of the provisions, purpose, or spirit of [Chapter 13]'") *Instant One Media, Inc. v. Shank (In re Shank)*, 2024 WL 1508126, at *4 (10th Cir. BAP Apr. 9, 2024) (quoting *In re Gier*, 986 F.2d 1326, 1329 (10th Cir. 1993)). *See also In re Lewis*, 2024 WL 845947, at *15 (Bankr. D. Colo. Sept. 28. 2024) (utilizing totality of circumstances framework); *In re Johnson*, 2021 WL 6053832, at *9 (Bankr. D. Colo. Dec. 15, 2021) ("Generally, 'in determining whether a Chapter 13 petition has been filed in bad faith under Section 1307(c), the bankruptcy court must consider the 'totality of the circumstances.'"); *Tomasini*, 339 B.R. at 776 (employing the totality of the circumstances test under Section 1325(a)(7)).

Since the phrase "good faith" is not defined in Section 1325(a)(7), courts have identified a series of factors to be considered in the totality of the circumstances approach. In *Gier*, the Tenth Circuit endorsed the following seven factors as relevant to a Section 1307(c) bad-faith filing inquiry:

> [1] the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding; [2] the timing of the petition; [3] how the debt arose; [4] the debtor's motives in filing the petition; [5] how

the debtor's actions affected creditors; [6] the debtor's treatment of creditors both before and after the petition was filed; and [7] whether the debtor has been forthcoming with the bankruptcy court and the creditors.

*Gier*, 986 F.2d at 1329.[7]  The factors identified in a Section 1307(c) analysis (such as in *Gier*) for whether a case should be dismissed for a bad faith filing are typically used in the analogous Section 1325(a)(7) context although dismissal under Section 1307(c) is a more draconian remedy than denial of plan confirmation under Section 1325(a)(7).  *In re Wareham*, 553 B.R. 875, 880 (Bankr. D. Utah 2016)("Like § 1307(c), the inquiry under § 1325(a)(7) considers the 'totality of the circumstances' and the *Gier* factors."); *Lewis*, 2024 WL 845947, at *15 (applying *Gier* factors under Section 1325(a)(7)).[8]  In fact, both the Debtor and Mr. Sherbon agree that the Court should apply the *Gier* factors to resolve the Section 1325(a)(7) objection.  (Docket No. 98 at 5-6; Docket No. 100 at 3.)

**2.**     **Summary of Mr. Sherbon's Arguments Against a Finding of Good Faith.**

Mr. Sherbon asserts that the Court should view the Debtor's filing as not having been made in good faith because in Chapter 13 she can discharge the Sherbon Claim, a debt which would otherwise be nondischargeable in Chapter 7.  Mr. Sherbon also asserts that the Court should view the Debtor's filing as a bad-faith filing because, in his view, the Debtor could simply have drawn on the credit available under HELOC to pay him the equalization payment under the Permanent Orders rather than filing for relief under Chapter 13.  Mr. Sherbon contends that, by seeking Chapter 13 relief, the Debtor is effectively seeking to retain 100 percent of the equity in the Residential Property while denying him his due share.  He notes that the Debtor did, in fact, borrow from the HELOC for purposes of buying the used Lincoln, and argues that this shows that she is

---

[7]     Though no party has moved to dismiss the case as having been filed in bad faith pursuant to 11 U.S.C. § 1307(c), dismissal for "cause" may naturally follow if the Court were to determine that the Debtor's had filed her Chapter 13 case in bad faith.  *See Sullivan v. Solimini (In re Sullivan)*, 326 B.R. 204, 211 (1st Cir. BAP 2005) ("[I]t is well established that lack of good faith (or bad faith) is 'cause' for dismissal or conversion of a Chapter 13 case under § 1307(c)."); *Armstrong v. Rushton (In re Armstrong)*, 303 B.R. 213, 221 (10th Cir. BAP 2004) ("The examples of cause listed in this subsection [1307(c)] are not exclusive, and good faith inquiries have traditionally been encompassed by § 1307(c)."); *Gier*, 986 F.2d at 1329-30 (noting that good-faith inquiries are encompassed by Section 1307(c)); *In re Plese*, 61 B.R. 143, 156-57 (Bankr. D. Colo. 2024) ("Although unenumerated in the statute, a debtor's lack of good faith in filing its bankruptcy petition may serve as 'cause' for dismissal under Section 1307(c).").  As the Debtor notes, the Supreme Court has held that a debtor's conduct must be "atypical" to qualify as "bad faith" conduct sufficient to support dismissal of a Chapter 13.  *Marrama*, 549 U.S. at 374-75 and n.11.

[8]     In *Tomasini*, the court utilized a variant of the *Gier* factors under Section 1325(a)(7) and identified the following as relevant: "(1) the timing of the petition; (2) how the debt(s) arose; (3) the debtor's motive in filing the petition; (4) how the debtor's actions affected creditors; (5) why the debtor's prior case was dismissed; (6) the likelihood that the debtor will have a steady income throughout the bankruptcy case, and will be able to properly fund a plan; and (7) whether the Trustee or creditors object."  *Tomasini*, 339 B.R. at 782.  The *Tomasini* court borrowed those factors verbatim from a decision concerning a motion to extend the automatic stay under Section 362(c)(3): *In re Galanis*, 334 B.R. 685 (Bankr. D. Utah 2005).  However, the *Tomasini* court emphasized that the most probative factor was the "debtor's subjective motive" for filing for bankruptcy protection.  *Tomasini*, 339 B.R. at 782.

willing to borrow from the HELOC when it suits her own purposes, but not when it comes to paying him. Mr. Sherbon further suggests that the Debtor is voluntarily underemployed in that she could be working more hours at a higher-wage job, and argues that this is further evidence that the Debtor filed her case with the bad-faith goal of retaining property while not paying all she could to creditors. Distilling the foregoing to their essence, during cross-examination at the trial, Mr. Sherbon asserted that the Debtor's bankruptcy filing must have been in bad faith because the Debtor had not paid him for the debt under the Permanent Orders.

### 3.   The Debtor Filed Her Petition for Bankruptcy Protection in Good Faith.

The Court starts its Section 1325(a)(7) analysis with the relevant *Gier* factors:

### a.   The Nature of the Debt, Including the Question of Whether the Debt Would Be Nondischargeable in a Chapter 7 Proceeding.

It is common ground that the Debtor owes Mr. Sherbon $110,226.54 per the Permanent Orders. In the Memorandum Opinion, the Court determined that the Sherbon Claim constituted an unsecured property settlement rather than a domestic support obligation. Domestic support obligations are excepted from discharge by Section 523(a)(5). And, in Chapter 7 cases, so too are debts "to a spouse, former spouse, or child of the debtor and not of the kind described in [Section 523(a)(5)] that [are] incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record . . ." — *i.e.*, property settlements. 11 U.S.C. § 523(a)(15).

However, Congress made a different decision for Chapter 13 cases. In Chapter 13, property settlements *are* dischargeable pursuant to Section 1328(a)(2), which provides for the discharge of such debts upon completion of all payments under a Chapter 13 plan. *See* 11 U.S.C. § 1328(a)(2) (providing for discharge upon completion of all payments under a Chapter 13 plan but excepting from discharge debts "of the kind specified in paragraph (1)(B), (1)(C), (2), (3), (4), (5), (8), or (9) of section 523(a)"). *See also*, *e.g.*, *In re Sullivan*, 2025 WL 2900246, at *3 (Bankr. D. Colo. Oct. 10, 2025) (recognizing that debts that fall within § 523(a)(15), such as equalization payments, are automatically nondischargeable in Chapter 7 cases, but can be discharged in Chapter 13 cases, and citing Section 1328(a)(2)). Thus, if the Operative Plan were to be confirmed, and if the Debtor were to make all payments due under the Operative Plan, she would receive a discharge and would no longer be obligated to pay the Sherbon Claim beyond the amounts paid under the Operative Plan (which would be a small fraction of the Sherbon Claim).

Mr. Sherbon's counsel argued that the Debtor should have borrowed $110,226.54 from Canvas Credit Union through the Debtor's HELOC to pay Mr. Sherbon. But, the evidence is uncontested that, if the Debtor had borrowed enough to pay the equalization payment to Mr. Sherbon using a further borrowing under the

HELOC, her payment on the HELOC alone would have been almost two times the amount of the Debtor's primary mortgage payment — thus, setting the Debtor up for financial failure resulting from her being obligated to make payments she could not have made based on her income and expenses as set forth in her Schedule I and Amended Schedule J.[9]  The result would be the Debtor's losing the Residential Property.  And, in any event, there is no obligation for a debtor to borrow money from one creditor to pay another.

Faced with her dire financial circumstances and unable to reach an agreement with Mr. Sherbon, it is no wonder that the Debtor chose Chapter 13, an option that allows her to retain her home, her vehicle, and the other necessaries to begin anew, assuming the Debtor complies with the obligations set forth in Chapter 13 and the Operative Plan.  She proposes, in the Operative Plan, to commit all of her disposable income for five years to payment of creditors.  The Court finds that the Debtor has met the benefit of the bargain struck in the Chapter 13 system.  *Cf. In re Smith*, 286 F.3d 461, 467 (7th Cir. 2002) (holding that, in analyzing whether a plan is proposed in good faith as required by Section 1325(a)(3) "[w]hat is required is "that the plan must be '*proposed* in good faith,' not that the debt was incurred in good faith" and ruling that a "Chapter 13 plan may be confirmed despite even the most egregious pre-filing conduct where other factors suggest that the plan nevertheless represents a good faith effort by the debtor to satisfy his creditor's claims") (internal citations omitted, emphasis in original).

Though Mr. Sherbon, understandably, does not like that the Debtor is able both to exempt the equity in the Residential Property from attachment and discharge the Sherbon Claim in Chapter 13, that is precisely what Chapter 13 allows.  "Congress has made it clear that some debts, although nondischargeable in Chapter 7 may be discharged under the more liberal rules of Chapter 13."  *Smith*, 286 F.3d at 467.  In enacting Section 1328(a)(2), Congress clearly recognized that, in some cases, the right of a debtor's spouse or former spouse to receive a property equalization payment of the type provided for in Section 523(a)(15) might have to fall in order for a deserving debtor to receive a fresh start.

So, while the Court is sympathetic to Mr. Sherbon's plight (as it is to all creditors who lose the right to be fully repaid in bankruptcy cases), the Court simply is "not free to second-guess Congress's policy choice in this regard."  *Smith*, 286 F.3d at 467.  *See also In re Williams-Bell*, 2025 WL 1920823, at *6 (Bankr. N.D.N.Y. Jul. 11, 2025) ("[W]hile this policy may result in inequitable treatment in the eyes of Creditor, the Court must abide by Congress's language and intention.").  As such, the Court finds that the fact that the Debtor chose to file for Chapter 13 rather than Chapter 7 relief does not compel a finding of bad faith.  *See Sullivan*, 2025 WL 2900246, at *3 ("'[T]he fact a

---

[9]     In contrast, when the Debtor borrowed money from the HELOC to pay for the Lincoln, she increased the payment to an affordable amount (at present, the Debtor pays $180.10 per month on the HELOC, per her Amended Schedule J (Docket No. 35)), an amount she has been able to pay and an amount which is necessary because the Debtor cannot get to work or her various medical appointments without a vehicle.

debtor seeks to take advantage of the broader discharge provisions of Chapter 13 is not, in and of itself, a reflection of bad faith.'") (quoting *In re Lanham*, 346 B.R. 211, 219 (Bankr. D. Colo. 2006)); *Smith*, 286 F.3d at 468.  The Court does not weigh this factor against the Debtor.

### b.   The Timing of the Petition.

The Debtor filed her petition for relief on April 22, 2024 — a mere 9 days prior to the date the hearing on the Contempt Motion was set to commence, thereby halting further proceedings on the Contempt Motion.  The Court assesses that one reason the Debtor filed her bankruptcy petition on April 22, 2024, was to halt the Contempt Motion.  But, that was not the primary reason.  The main reason was that the Debtor was in severe financial straits and unable to pay her creditors.  Besides, timing of a petition to stay a pending court proceeding is typical and does not weigh for or against a finding of good faith.

### c.   How the Debt Arose.

On the petition date, the Debtor owed creditors with unsecured claims a total of $194,624.54.  The $110,226.54 Sherbon Claim is the most significant debt owed by the Debtor.  The remaining claims are for typical consumer debt, such as debt owed to banks and credit card companies, student loan debt, and debt for legal fees.  Both the Sherbon Claim, and a debt owed to Sue Kokinos, arose from the Divorce Case.  The debts did not arise from fraud or malfeasance, and the Debtor's inability to pay them is not due to circumstances within her control.  Accordingly, the Court finds that this factor does not weigh for or against a finding of good faith.

### d.   The Debtor's Motives in Filing the Petition.

The most important factor in assessing good faith under Section 1325(a)(7) is the "debtor's subjective motive" in filing for bankruptcy protection.  *Tomasini*, 339 B.R. at 782.  The Debtor testified, very credibly, that she filed for bankruptcy because of a series of unfortunate and unexpected events that adversely affected her financial condition including (as set forth above): the loss of her job as an Operations Manager with Colorado Del, LLC in October 2023; her unemployment from October 2023 through March 2024; her failure to obtain unemployment benefits because of identity theft; her incapacitation from COVID in November 2023; her daughter's medical issues from COVID in November 2023; her physical impairment from breaking her arm and associated surgery in December 2023; time spent in physical therapy in early 2024; her daughter's multiple hospitalizations and surgery in early 2024; and other issues, including the increased costs of caring for a young child.  The Debtor simply could not meet her financial obligations to Mr. Sherbon under the Permanent Orders and had no way to pay other creditors.  The Debtor's financial position was so tenuous that she qualified for SNAP benefits.

The Debtor credibly testified that she sought bankruptcy relief under Chapter 13 mainly in order to keep a roof over her and her daughter's head, and to retain a vehicle that she could use to get to and from work, both of which she viewed as necessary to providing for her family's basic needs.  Bankruptcy was a last resort for the Debtor.  The Court credits the Debtor's testimony that if there had been any other acceptable option, the Debtor would not have filed for bankruptcy.  She is prideful, a good saver, and has always been financially responsible.  The Debtor was hoping to find way to pay Mr. Sherbon and her other creditors — not avoid her obligations.  But, by April 2024, she was in a completely untenable financial position and facing mounting pressure including the Contempt Motion.

The Court does not view the Debtor's choice to file for Chapter 13 as having been motivated primarily by a malicious desire to discharge the Sherbon Claim.  Instead, the Court assess the Debtor's bankruptcy decision as a rational choice, made by an honest person faced with a set of exceedingly difficult circumstances that left her unable to repay her debts while retaining the necessaries required to have a fresh start.  In fact, Chapter 13 bankruptcy was seemingly designed for people just like the Debtor.  The Debtor's subjective motive in filing for bankruptcy protection in no way shows a lack of good faith.

### e.     How the Debtor's Actions Affected Creditors.

In this case, as in every case, the Debtor's action in filing the bankruptcy petition left her creditors in the lurch.  Mr. Sherbon, in particular, will be harmed because the Operative Plan proposes to pay him (and other general unsecured creditors) just pennies on the dollar.  Mr. Sherbon testified, credibly, that he intended to use the funds from the equalization payment under the Permanent Orders to make a downpayment on a home of his own, and that he will not be able to do so if the Operative Plan is confirmed.  Mr. Sherbon has also been left on the hook to pay a significant portion of the debts incurred during the parties' marriage, and will now be left to pay those without receiving the benefit of his share of the parties' marital estate.

Mr. Sherbon was also harmed by the Debtor's filing of the petition late in the game — that is, after Mr. Sherbon had already gone to the expense of filing the Contempt Motion, serving it, and preparing for the hearing on the Contempt Motion.  He is now liable to pay for such legal expenses, and, without the equalization payment, may not be able to do so.  The Court weighs this factor slightly against the Debtor in the good-faith analysis while recognizing that, in bankruptcy, creditors are seldom paid in full.

### f.     The Debtor's Treatment of Creditors Both Before and After the Petition Was Filed.

The Debtor, like almost all bankruptcy debtors, did not pay her creditors in full before or after her bankruptcy filing.  But, importantly, other than filing for bankruptcy relief, she did not engage in any behavior that hindered their efforts to collect from her.

She did not commit fraud or malfeasance.  She did not hide assets.  She did not incur larger unsecured debts from any creditor for purposes of making payments to preferred creditors.  Further, in the spring of 2023, the Debtor tendered $21,424.28 to Mr. Sherbon consistent with the Oral Ruling.  Unfortunately, Mr. Sherbon rejected such funds.  Later, the Debtor attended mediation with Mr. Sherbon in the hope of reaching an alternative plan for payment of the Sherbon Claim, but was unable to reach an agreement with him.

Mr. Sherbon seems to attack the Debtor's use of the homestead exemption in arguing that he was treated wrongly.  The commencement of a bankruptcy case creates an estate that includes "all legal or equitable interests of the debtor in property." 11 U.S.C. § 541(a).  However, a debtor may exempt certain property from the bankruptcy estate.  11 U.S.C. § 522(b); *see also Kulp v. Zeman (In re Kulp)*, 949 F.2d 1106, 1107 (10th Cir. 1991) (noting ability to exempt property from the estate pursuant to Section 522(b)).  Section 522 contains a list of approved federal exemptions but also permits States to "opt-out" from federal exemptions and substitute State exemptions instead.  Colorado elected to "opt-out" from the federal exemption scheme.  Colo. Rev. Stat. § 13-54-107 (federal exemptions are "denied to residents of this state"; Colorado residents may only claim exemptions under Colorado statutes).  As a result, Colorado law governs exemptions claimed by Colorado residents such as the Debtor.  11 U.S.C. § 522; *Law v. Siegel*, 571 U.S. 415, 425 (2014) ("when a debtor claims a *state-created exemption*, the exemption's scope is determined by state law") (emphasis in original); *Kulp*, 949 F.2d at 1107-08 (interpreting Colorado exemption statutes).

"Exemptions are granted by statute to provide the debtor with a fresh start and keep families from destitution."  *In re Jones*, 446 B.R. 466, 472 (Bankr. D. Kan. 2011). Indeed, "it is . . . well-established that the purpose of [Colorado's] homestead exemption is to provide protection for a debtor's home for himself and his dependents and assure that a debtor and his family have a residence despite insolvency."  *In re Polimino*, 345 B.R. 708, 711-12 (10th Cir. BAP 2007) (citing *Wallace v. First Nat'l Bank of Colo. Springs (In re Wallace's Estate)*, 246 P.2d 894, 901 (Colo. 1952)); *Fleet v. Zwick*, 994 P.2d 480, 482 (Colo. Ct. App. 1999).  *See also Romero v. Tyson (In re Romero*), 579 B.R. 551, 553-54 (D. Colo. 2016) ("'The purpose of Colorado's homestead exemption is to secure to a householder a home for himself and his family, regardless of his financial condition.'") (quoting *In re Harwell,* 2008 WL 410590, at *3 (D. Colo. Feb. 13, 2008), in which the District Court cited *Matter of Lombard*, 739 F.2d 499 (10th Cir.1984)).  So, claiming a homestead exemption is not nefarious misconduct.

Mr. Sherbon also argues that the Debtor could be working full-time in a different, more lucrative job that would enable her to pay more to her creditors and, potentially, avoid bankruptcy all together, and that her failure to have done so when she filed her bankruptcy petition constitutes evidence of bad faith.  The Court disagrees.  Again, the focus is on whether the Debtor filed her petition on April 22, 2024 in bad faith.  Six months before filing for bankruptcy, the Debtor lost her job as an Operations Manager with Colorado Del, LLC.  She was unemployed from October 2023 through March 2024 but was not able to obtain unemployment benefits because of identity theft.  Four

months before her petition, the Debtor suffered incapacitation from COVID.  A month later, she broke her arm which required surgery.  In early 2024, the Debtor spent time in physical therapy and her young daughter suffered multiple hospitalizations and surgery.  The Debtor suffered more physical impairments and has not recovered full use of her broken arm.  To suggest that the Debtor somehow should have secured a high-paying full-time job in the interval between October 2023 and April 2024 (right before she filed for bankruptcy protection) obviously is nothing more than wishful thinking not based on the Debtor's actual circumstances.  None of that negates the Debtor's good faith in filing for bankruptcy.

### g.  **Whether the Debtor has Been Forthcoming with the Bankruptcy Court and the Creditors.**

The Debtor has been entirely forthcoming with the Court and creditors.  The Court weighs this factor in the Debtor's favor.

### h.  **Conclusion After Considering the Totality of the Circumstances.**

The Court understands why Mr. Sherbon would be disappointed or even angry about the Debtor's decision to file for Chapter 13 relief.  Mr. Sherbon would like to be paid more than proposed in the Operative Plan, through which he will receive very little.  Creditors in most bankruptcy cases undoubtedly share Mr. Sherbon's views.

However, Congress enacted Chapter 13 of the Bankruptcy Code to protect people just like the Debtor.  The Debtor has not abused the "provisions, purpose, or spirit of [Chapter 13]."  *Gier*, 986 F.2d 1329.  Based on the totality of the circumstances, the Court determines that the Debtor filed for bankruptcy in good faith only as a last resort and is doing all she can to repay her creditors and obtain a fresh start.  Accordingly, the Court finds that the Debtor's bankruptcy filing satisfies the requirements of Section 1325(a)(7).

\* \* \* \* \*

Having determined that the Debtor satisfied the requirements of both Sections 1325(a)(4) and (a)(7), which were contested in the Plan Objection, the Court also finds that the Debtor has met all the other remaining requirements for confirmation of the Operative Plan under Section 1325(a).

## VI.    <u>Conclusion and Order</u>

For the foregoing reasons, the Court OVERRULES the Plan Objection and finds that the Debtor has demonstrated that the Operative Plan must be confirmed pursuant to Section 1325.  Therefore, the Court ORDERS that the Operative Plan is CONFIRMED.

DATED this 2nd day of December, 2025.

BY THE COURT:

Thomas B. McNamara,
United States Bankruptcy Judge